Marc A. STRETTEN, Plaintiff-Appellee,

v.

WADSWORTH VETERANS HOSPITAL
et al., Defendant-Appellants.

No. 75–2309.

United States Court of Appeals,
Ninth Circuit.

May 18, 1976.

Rehearing and Rehearing En Banc
Denied Aug. 27, 1976.

John K. Villa, Atty. (argued), of Appellate Section, Civ. Div., Dept. of Justice, Washington, D. C., for appellants.

Ronald F. Merlino, Los Angeles, Cal., (argued), for appellee.

Before HUFSTEDLER, SNEED and KENNEDY, Circuit Judges.

SNEED, Circuit Judge:

This case reaches us as an appeal from the district court order stating that plaintiff Stretten was entitled both under federal statute and under the Constitution to notice and a trial-type hearing prior to his dismissal from his position as a resident physician in pathology at Wadsworth Veterans Hospital. In addition, the lower court enjoined the dismissal of plaintiff from the residency program.[1] We find no statutory claim to such a procedure. Further, we disagree with the district court's finding that a *liberty* interest of plaintiff has been infringed by his dismissal. While we agree with plaintiff and the district court that plaintiff did have a *property* interest in retaining his residency for four

---

1. The lower court also prevented hospital authorities from removing plaintiff Stretten from duties involving patient care in spite of their belief in his incompetence and no substantial allegations of bad faith.

years, we disagree with the conclusion that such an interest mandates a full scale adversary hearing, either before or after dismissal. We feel that the requisites of due process were met in this case and hence we reverse and direct the district court to dissolve its injunction.

## I. *The Facts.*

Plaintiff Marc A. Stretten is a physician who began employment on November 26, 1972 as a resident in pathology at Wadsworth Veterans Administration Hospital in Los Angeles. The form appointing Dr. Stretten described his appointment as being "for [the] duration of this training unless sooner terminated, and . . . subject to periodic review by resident review board." On August 13, 1973, Dr. Fishkin, Chief of Laboratory Services at Wadsworth, sent Dr. Stretten a memorandum informing him that his residency would be terminated in November 1973, the end of Stretten's first year as a resident. The memorandum made explicit that the termination was for unsatisfactory performance and "other considerations." The memorandum pointed out that several staff members had consulted with Dr. Stretten concerning his unsatisfactory performance during the period of his residency.

On October 16, 1973, the Resident Review Board met to consider the reappointment of Dr. Stretten. The three members of that Board, which included Dr. Fishkin, were unanimous in their decision not to reappoint Dr. Stretten.[2] This was evidently the first time in the twenty-year history of the residency program at Wadsworth that it had been necessary formally to terminate a resident prior to the end of his training program.[3] The Director of the hospital approved the recommendation of the Resident

Review Board not to reappoint Dr. Stretten and he was notified of this action on November 5, 1973. On November 7, 1973, Dr. Stretten, accompanied by, but not formally represented by, counsel, attended a meeting in which he was permitted to question Dr. Fishkin and the staff pathologists about the reasons for their failure to recommend that he be reappointed. At this time, Dr. Stretten was given quite detailed comments concerning the unsatisfactory nature of his performance. It also seems clear from the record of this discussion that Dr. Stretten had been informed, generally in a constructive manner, by several members of the staff of his unsatisfactory performance and attitude far in advance of any move to terminate his employment.

On November 21, 1973, Dr. Stretten filed suit in federal district court alleging that defendants denied him a full hearing prior to termination, as was his right under 38 U.S.C. § 4110. In addition, plaintiff alleged that his Fifth Amendment due process rights were abridged when he was terminated without a full adversary hearing. On this appeal appellees seek reversal of the lower court judgment for defendant on the merits and dissolution of the preliminary injunction.

## II. *Plaintiff's Right To a Hearing Under 38 U.S.C. § 4110.*

The validity of plaintiff's claim of a right to a hearing under existing statutes hinges upon the interpretation to be given to three sections of Title 38 of the United States Code, sections 4104, 4110 and 4114(b), which deal with the Veterans' Administration Department of Medicine and Surgery. Section 4104 gives the administrator the authority to hire physicians;[4] section 4114(b)

2. At the same meeting it was decided that another resident would also not be reappointed.

3. Defendants argue that there had been other residents whose performance was unsatisfactory, but that their resignations had been tendered prior to any formal termination.

4. "There shall be appointed by the Administrator additional personnel as he may find necessary for the medical care of veterans, as follows:
(1) Physicians, dentists, and nurses;
(2) Managers, pharmacists, physical therapists, occupational therapists, dietitians, and other scientific and professional personnel, such as optometrists, pathologists, bacteriologists, chemists, bio-statisticians, and medical and dental technologists." 38 U.S.C. § 4104.

gives the administrator authority to establish residencies and internships.[5] The provision on which Dr. Stretten heavily relies, section 4110, provides for notice and a full adversary hearing in front of a disciplinary board composed of senior physicians in cases where there is a charge "of inaptitude, inefficiency, or misconduct of any person employed in a position provided in paragraph (1) of section 4104 of this title." 38 U.S.C. § 4110.

Dr. Stretten's argument is simple. He insists that since residents are physicians, *i. e.*, they have M.D. degrees, the authority to hire residents under section 4114(b) must derive from section 4104. Thus, he continues, section 4110 procedural rights are applicable to residents since they are merely one type of physician. In addition, Dr. Stretten points out that inasmuch as residents have appointments of far longer duration than the ninety-day maximum allowed for section 4114(a) "temporaries,"[6] he is not within the embrace of that section and thus excluded from the rights afforded by section 4110. We disagree with this reading of the statutory scheme.

First, the plain language of the statute unmistakably indicates that the source of authority to employ residents is section 4114(b) and not section 4104. Section 4114(b) does not say that the authority granted under section 4104 *shall include* the authority to establish residencies and internships. It states that "[t]he Administrator *shall have authority* to establish residen-

cies and internships . . ." (emphasis supplied). This is a grant of new authority, not an expansion of old. Section 4110 speaks only of according procedural rights to "any person employed in a position provided in paragraph (1) of section 4104 of this title." If Congress had meant to include positions created by section 4114(b) it could easily have done so.

■ Second, plaintiff's argument that residents are physicians within the meaning of section 4104 is not persuasive. The Congress clearly meant to use the term "physician" as a title of a position and not as synonymous with a holder of an M.D. degree. This is made plain by examining section 4105 dealing with qualifications of appointees in the Department of Medicine and Surgery.[7] A medical service appointee must not only have an appropriate medical degree, but must also have completed an internship and be licensed to practice medicine. Interns and residents do not have to meet these qualifications.[8] Section 4114(b) plainly leaves the qualifications of residents and interns within the discretion of the Administrator. Thus it seems to us to be contrary to the logic of the statutory scheme to argue that section 4114(b) residents are also section 4104 physicians.

■ Finally, the legislative history of section 4114 confirms its plain meaning by strongly indicating that Congress intended it to be a grant of authority to the Administrator which is independent of the authority

---

**5.** "(b) The Administrator shall have authority to establish residencies and internships; to appoint qualified persons to such positions without regard to civil-service or classification laws, rules, or regulations; and to prescribe the conditions of such employment, including necessary training, and the customary amount and terms of pay during the period of such employment and training." 38 U.S.C. § 4114(b).

**6.** Plaintiff attempts to bolster his argument by asserting that residents are not "temporary" or "part-time"—which are the two labels used in the heading of section 4114. However, as the legislative history makes clear, resident physicians are part-time in the sense that much of their time is devoted to education in their specialty. *See* p. 365 *infra.*

**7.** *"Qualifications of appointees*

Any person to be eligible for appointment in the Department of Medicine and Surgery must—

(1) be a citizen of the United States;

(2) in the Medical Service—

hold the degree of doctor of medicine or of doctor of osteopathy from a college or university approved by the Administrator, have completed an internship satisfactory to the Administrator, and be licensed to practice medicine, surgery, or osteopathy in a State . . . ." 38 U.S.C. § 4105.

**8.** We note in passing that plaintiff Stretten could not have qualified as a section 4104 physician.

granted under section 4104. The House Report states:

This section also provides for the establishment of residencies and appointment to such positions without regard to civil service or classification laws, rules, or regulations; the conditions of such employment; and the customary amounts and terms of pay during the period of such training. Residency training in most specialties would embrace training outside the hospital in connection with the school, part of the time not being spent on work directly productive for the Veterans' Administration. *It is not practicable to appoint such personnel to an established position, such as the doctor, junior grade. This authority is granted* in order to retain uniformity with actual practice throughout the United States . . . .. (italics added)

H.R.Rep.No.1238, 79th Cong., 1st Sess. 5 (1945). In addition, the House debates of the Act make clear that the members of the committee which wrote the bill intended that section 4114 employees were different from section 4104 physicians.[9] One member stated plainly that section 4114(b) was written in response to VA Administrator Hawley's special concern that there be provided the power to establish residencies.[10]

In short, plaintiff's claim to a hearing under section 4110 is without merit.[11]

III. *Plaintiff's Constitutional Claim to Due Process.*

To evaluate Dr. Stretten's constitutional claim we must employ a two-step analysis. *Cf. Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). First we must determine whether his interest here being asserted rises to the level of a "property" or "liberty" interest. If the answer is no, the

second step becomes unnecessary because Dr. Stretten has no constitutional claim entitled to recognition. If, however, either a property or liberty interest is at stake, then we must weigh the competing interests of the individual and the state to determine what process is constitutionally required. We turn first to determine whether Dr. Stretten's claim involves an interest in liberty. Thereafter we will consider whether a property interest is involved.

A. Plaintiff's Claim of a Deprivation of Liberty.

At the outset it should be made clear that the recent decision of the Supreme Court in *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405, 44 U.S.L.W. 4337 (1976) does not obviate the need for inquiry into Dr. Stretten's liberty interest. In *Davis* the Court held that a liberty interest was not infringed when the *only* loss suffered at the hands of the Government is a "stigma" or damage to reputation. Unlike Davis, Dr. Stretten has, in addition to any damage to his reputation, suffered a tangible loss in being dismissed from his residency. The Court did not alter the holding of *Board of Regents v. Roth* which is that when the individual has suffered a tangible loss a liberty interest is implicated only when the state makes a "charge against him that might seriously damage his standing and associations in his community." 408 U.S. at 573, 92 S.Ct. at 2706. The *Roth* Court stated that a charge of dishonesty or immorality would implicate an individual's liberty interest. While *Roth's* line between "liberty" interests and all other interests is imprecise, this Circuit has concluded that it should be drawn on the basis of the nature of the charge used as a grounds for termination and not the actual consequences of the charge. Further, this Court has concluded that *Roth's* notion of liberty, while

9. Cong.Rec. 11658 (1945) (remarks of Representative Allen).

10. *Id.*

11. Defendants make the additional argument that even if plaintiff were hired under authority

of section 4104, he would not acquire the right to section 4110 procedures until a three-year probationary period had passed. 38 U.S.C. § 4106. In view of our resolution of the authority question, we find it unnecessary to reach this issue.

imprecise, distinguishes between a stigma of moral turpitude, which infringes the liberty interest, and a charge of incompetence or inability to get along with coworkers which does not. *Gray v. Union County Intermediate Educ. Dist.*, 520 F.2d 803 (9th Cir. 1975); *Jablon v. Trustees of California State Colleges*, 482 F.2d 997 (9th Cir. 1973).[12]

■ This distinction is a reasonable one. The "liberty interest" is the interest an individual has in being free to move about, live, and practice his profession without the burden of an unjustified label of infamy. *Board of Regents v. Roth*, 408 U.S. at 572, 92 S.Ct. at 2706, 33 L.Ed.2d at 557. In the context of *Roth*-type cases, a charge which infringes one's liberty can be characterized as an accusation or label given the individual by his employer which belittles his worth and dignity as an individual and, as a consequence is likely to have severe repercussions *outside* of professional life. Liberty is not infringed by a label of incompetence, the repercussions of which primarily affect professional life, and which may well force the individual down one or more notches in the professional hierarchy.[13] The distinction is not perfect; our utility affects our dignity and worth whether viewed from within or without. However, implicit in such a distinction is the notion that the constitutional need for procedural protection is not strong when the charge (*e. g.*, incompetence) involves a matter which is peculiarly within the scope of employer-employee relations and when the likely results of even a false charge are reduced economic returns and diminished prestige, but not permanent exclusion from, or protracted interruption of, gainful employment within the trade or profession. Employers, including the Veterans' Administration, have a strong interest in conserving resources and dealing expeditiously with incompetent employees.

■ The record in this case does not support the contention that Dr. Stretten's liberty interest has in any way been infringed. All the charges which surround his termination center around his inability to perform satisfactorily as a pathology resident, including an unwillingness or inability to deal with his coworkers in a professional manner. These are not the kind of charges which are likely to preclude Dr. Stretten from practicing medicine, and in fact there is evidence in the record that the charges may not have precluded him from staying in his specialty of pathology.[14] Thus we find no infringement of liberty and hence no deprivation of due process on that account.[15]

**B. Plaintiff's Property Interest in His Residency.**

It is clear from the Supreme Court decision in *Board of Regents v. Roth* that the Constitution protects interests not embraced within the traditional notions of real or personal property. However, the Court indicated that a benefit which merits protection as a property interest must be one to which there is more than a "unilateral expectation." 408 U.S. at 577, 92 S.Ct. at 2709, 33 L.Ed.2d at 560. Rather there must exist rules or understandings which allow the claimant's expectations to be characterized as "a legitimate claim of entitlement to [the benefit]." *Id.*

**12.** *See also Stewart v. Pearce*, 484 F.2d 1031 (9th Cir. 1973) (implied label of mental instability implicates liberty interest). *Pearce* is not support for plaintiff's argument. While there were some unofficial suggestions of possible instability made by staff members at Wadsworth, the reason for termination was incompetence and the only stigma of which plaintiff complains is incompetence.

**13.** But a label which would prevent an individual from practicing his chosen profession at all may have consequences so severe that liberty would be infringed. Such a formulation raises the possibility that in some cases due process rights will turn on a definition of the scope of a particular profession. In this case, both parties appear to have assumed that the relevant profession is "physician."

**14.** Dr. Stretten was offered a residency at Emory Hospital in Atlanta.

**15.** Plaintiff's complaint alleged that he was terminated for exercising his First Amendment rights. We agree with the trial court's finding that there was no substance in this allegation.

The defendants argue that the district court was in error in finding a property right in continuation as a pathology resident. Defendants assert that the district court relied in making this finding solely upon the historical infrequency of termination—a ground, defendants argue, which was implicitly rejected by the Supreme Court in *Roth*. We believe the defendant misreads both the district court's finding and overstates the scope of *Roth's* refusal to regard rehire rates as conclusively demonstrating a property interest.

It is inaccurate to characterize the holding of the court below as resting solely upon the statistical evidence of failures to terminate. Such failure to terminate was consistent with and reinforced by a specified four-year duration of the residency. The district court recognized this and stated that "[i]t is undisputed that the duration of the residency program in pathology was four years." We find nothing in the record which would lead us to overturn this finding.

Moreover, we believe *Roth* recognized that rehire rates under some circumstances may evidence a "common law of employment" sufficient to support the finding of a property interest. *See Board of Regents v. Roth*, 408 U.S. at 578 n. 16, 92 S.Ct. at 2710, 33 L.Ed.2d at 561. But we need not rest rejection of the defendant's position on this interpretation of *Roth*. Certainly nothing in *Roth* precludes the use of historical termination patterns as evidence that a plaintiff's claim is a property interest deserving of the protection of due process.

■ However, in holding that Dr. Stretten's claim to his residency is a property interest, we need not place primary reliance on the fact that no one had been officially terminated in the 20-year, 5,000-physician history of the program. Such reliance is unnecessary because Dr. Stretten, at the

time of his appointment, was advised that he would be employed for the "duration of this training unless sooner terminated, and subject to periodic review by resident review board" and, as found by the district court, the duration of the training was four years. We rely primarily on these facts in finding no error in the district court's conclusion that Dr. Stretten's claim to his residency is a property interest deserving of appropriate due process before it is removed.[16]

### IV. *The Process Which is Due.*

Recently the Supreme Court has enunciated the factors which are to be balanced in determining the process which is appropriate to protect a property interest. *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18, 44 U.S.L.W. 4224 (1976). The court held that such a determination:

. . . generally requires consideration of three distinct factors: first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of [a property] interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Id.* at 335, 96 S.Ct. at 903, 47 L.Ed.2d at 33, 44 U.S.L.W. at 4229.

We will discuss each of these factors in the context of Dr. Stretten's situation at Wadsworth VA Hospital. The balance among these factors must be used to determine both the extent and the timing of the procedures necessary to protect Dr. Stretten's property interest in his position as a resident pathologist.

16. Because the language of the appointment form was qualified, one could argue that Dr. Stretten's property right only existed as long as he was not terminated by the resident review board. *See Arnett v. Kennedy,* 416 U.S. 134, 151–54, 94 S.Ct. 1633, 1642–44, 40 L.Ed.2d 15, 31–33 (1974) (opinion of Rehnquist, J.). However, the Court has rejected such analysis and held that a property entitlement once created, cannot be limited in scope by procedural qualifications. *Goss v. Lopez,* 419 U.S. 565, 573–74, 95 S.Ct. 729, 735–36, 42 L.Ed.2d 725 (1975); *see The Supreme Court, 1974 Term,* 89 Harv.L. Rev. 85, 86–87 (1975).

Dr. Stretten's interests in keeping his position are to maintain his income, to complete the residency phase of his medical education, and to protect his professional reputation. Dismissal obviously would damage the first two interests, and the imputation of incompetence would damage the third.

The Hospital's interest is somewhat more complex. Like any government agency it has a strong interest in being able to deal quickly and inexpensively with personnel matters in order to promote efficiency and economy in administration. But because the government agency here is a hospital and plaintiff Stretten is a professional, the employer's interest is more particularized than in the ordinary case. As a hospital the employer has a special interest in protecting its patients from treatment by one who is professionally incompetent. The survival of patients often depends upon the presence of competent physicians. The interest of the hospital in enlarging the prospects of survival of patients weighs in favor of due process procedures which will minimize the risk of the continued employment of an incompetent doctor, so long as these procedures are consistent with notions of fundamental fairness.[17] In a sense this is the reverse side of the *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), coin. In *Goldberg* the danger of lack of survival was borne by the plaintiff whose rights were terminated while here the risk is borne by the patients entrusted to the defendant's care.

The Hospital's interest is unusual in another respect. Dr. Stretten is a professional whose position requires that he work in close coordination with other medical personnel. A hospital staff is highly interdependent, both in the sense that one doctor depends upon the professional skill of other doctors and in the sense that the collegial nature of the body makes tolerable working relationships an absolute prerequisite to effective staff performance. The necessity for a healthy working relationship is a function of the nature of the work to be done. Incompatible workers on farms, ranches, or in certain types of factories can function reasonably well although even there it is doubtful that full efficiency is achieved. Effective performance by physicians on the staff of a hospital, whose tasks require a high degree of cooperation, concentration, creativity, and the constant exercise of professional judgment, requires a greater degree of compatibility. The Hospital must recognize this necessity. This enhances its interest in quickly dealing with incompetence and debilitating personal frictions. In emphasizing the hospital's and thus the state's interest in harmony, we hasten to assert that we are not drawing the line between professionals and non-professionals for this purpose. In fact, we believe there is no clear line, rather only a continuum along which the state's interest in expeditious settlement of such problems attenuates.

■■■ The final factor mentioned by the court in *Mathews* was the risk of an erroneous decision prejudicial to the plaintiff under the procedures employed and the probable reduction of error which might result from a more elaborate or differently timed set of procedures. In Dr. Stretten's case, staff physicians submitted written evaluations of his technical competence and his ability to get along with his colleagues to the Resident Review Board. These opinions from experienced professionals in Stretten's field were based on months of close contact. With respect to the evaluations of his competence, it is improbable that an adversary procedure would enable a resident to undermine well-formulated opinions against him. Even so, the more important, and perhaps decisive, factor is the perceived inability of Stretten to cooperate effectively with his colleagues. The collective opinion that a resident is excessively abrasive would destroy the proper operation of a collegial, functionally-integrated group. The deci-

17. While the interests of a VA hospital and of its patients are clearly not identical for all purposes, we believe they are identical in the area of the competency of medical personnel.

sion-maker may give great weight to the group's opinion on this point.[18] Significantly, this perception is not easily shaken by cross-examination.[19] The procedural implications of these considerations is that a full adversary hearing is unlikely to be more useful than less elaborate procedures in revealing any flaws that would undermine the case against a terminated resident.

■ The ultimate decision-maker must have wide discretion in considering the evidence against a resident. This includes the power to attach great value to the considered opinions of the resident's colleagues. It is bound, however, not to act in bad faith or arbitrarily and capriciously. The resident's interest is important enough that he should have notice of his deficiencies, should have an opportunity to examine the evidence against him, and should be allowed to present his side of the story to the decision-maker. These procedures will insure that all relevant data are before the decision-maker and will allow the terminated resident and any reviewing court to judge whether the decision-maker acted in bad faith or arbitrarily and capriciously. A termination procedure effective for these purposes was followed in this case. We hold that due process does not require a full adversary hearing either before or after termination.

■ The only remaining question is whether the protection of Dr. Stretten's interest requires that these procedures occur prior to termination. In a case where the decision to terminate is made long before the termination date, as was true here, we see no interest of the state which is furthered by delaying the resident physician's right to examine the evidence and tell an opposing version of the story until after termination. Following such procedures prior to termination may do much, in case error is exposed, to vindicate a resident's interest in his salary, reputation as a competent professional, and his interest in uninterrupted training.[20] In this case, however, the lower court's temporary restraining order and preliminary injunction had the practical effect of making the November 7 staff meeting a pre-termination hearing.

We hold that Dr. Stretten's property interest was adequately protected and hence the decision on the merits of the trial court is reversed and the case dismissed. The

18. There is no constitutional requirement that the decision-maker be an uninvolved person when a property interest protected by due process is at stake. *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (only Justice White disagreed with this proposition). In addition, Dr. Stretten's property right does not imply a right to the job if an "impartial" group of experts finds him competent. First, competence is just one variable; ability to function in a group is a second. Clearly, the opinion of the rest of the group is the best evidence of the latter. Furthermore, in a highly technical occupation, the members of the profession should have the power to set their own standards. Due process requires that the evaluations of whether one gets along and meets the standards not be made in bad faith or arbitrarily and capriciously.

19. We hasten to add that if the reason a resident is thought to be abrasive stems from a constitutionally impermissible reason, for example, racial bias, the plaintiff may submit evidence to the decision-maker and, if necessary, to a reviewing court. In the present case, Stretten's first amendment claim was found to be without merit.

20. It should be made clear, however, that we do not hold that a hospital must follow these procedures in every case, no matter how serious or dangerous the incompetence of a resident. In a case where patient welfare is in immediate jeopardy or where the effective functioning of the hospital is severely threatened, a hospital might well be justified in immediate termination with the informal hearing procedures held shortly thereafter. *See Goss v. Lopez,* 419 U.S. 565, 582–83, 95 S.Ct. 729, 740–741, 42 L.Ed.2d 725 (1975). Another alternative would be for the hospital to suspend the resident with pay until such time as a hearing could be held. *Cf. Peacock v. Board of Regents,* 510 F.2d 1324, 1328 (9th Cir. 1975). Or the hospital could provide back pay in the event it determined at a later hearing that the resident had been improperly discharged. *Cf. Arnett v. Kennedy,* 416 U.S. 134, 169–70, 94 S.Ct. 1633, 1651–52, 40 L.Ed.2d 15, 42 (1974) (Opinion of Powell, J.). We have no occasion to decide under what circumstances each of these alternatives would be most appropriate.

injunction preventing termination is dissolved.

REVERSED.