Robert McMILLAN, Appellant and
Cross-Appellee,

v.

ANCHORAGE COMMUNITY HOSPI-
TAL, a nonprofit corporation, Ap-
pellee and Cross-Appellant.

Nos. 5415, 5485.

Supreme Court of Alaska.

June 25, 1982.

David C. Crosby and Charles A. Goldmark, Wickwire, Lewis, Goldmark & Schorr, Seattle, Wash., and Michael J. Frank, Baily & Mason, Anchorage, for appellant and cross-appellee.

Brian J. Brundin and Timothy R. Byrnes, Hughes, Thorsness, Gantz, Powell & Brundin, Anchorage, for appellee and cross-appellant.

Before RABINOWITZ, C. J., CONNOR, BURKE and COMPTON, JJ., and DIMOND, Senior Justice.*

## OPINION

DIMOND, Senior Justice.

This appeal concerns the suspension of a doctor's staff privileges at Anchorage Community Hospital (hospital). Dr. Robert McMillan, an anesthesiologist, received medical staff privileges at the hospital in 1973. His privileges were summarily suspended in 1975 because his activities and professional conduct were deemed to be disruptive of the operations of the hospital.

The primary contention raised by McMillan on appeal is that the hospital improperly used summary suspension procedures to remove his staff privileges. McMillan argues that, according to the provisions of the medical staff bylaws and the requirements of due process, summary suspension is not proper unless there is an immediate threat to patient care or safety. He claims that the hospital's grounds for suspension of his privileges, even if true, are not sufficient to meet the standards for summary suspension.

The medical staff of the hospital consists of physicians who have been granted permission by the hospital to use its facilities. The medical staff is organized into a self-governing body with bylaws adopted from a model set of bylaws promulgated by the Joint Commission on Accreditation of Hospitals. The hospital has approved the bylaws, and the Board of Trustees of the hospital exercises final authority over staff appointment, reappointment and revocation of privileges. Certain members of the medical staff, the Board of Trustees and the chief executive officer of the hospital have the power to initiate procedures which can lead to the removal of staff privileges.

Article VII of the medical staff bylaws of the hospital governs procedures for corrective action against a physician with staff privileges. Article VII, section 1, and article VII, section 2, are the two types of corrective action procedures at issue in this appeal.[1]

Under section 1, corrective action first requires a series of informal investigations and hearings. If they result in a recommendation of reduction, suspension or revocation of privileges, or expulsion from the

---

* Dimond, Senior Justice, sitting by assignment made pursuant to article IV, section 11, of the Constitution of Alaska and Alaska R.Admin.P. 23(a).

1. Art. VII, § 1(a), provides in part:
 Whenever the activities or professional conduct of any practitioner with clinical privileges are considered to be lower than the standards or aims of the medical staff or to be disruptive to the operations of the hospital, corrective action against such practitioner may be requested by any officer of the medical staff, by the chairman (chief) of any clinical department, by the chairman of any standing committee of the medical staff, by the chief executive officer, or by the governing body [Board of Trustees of the hospital].
 Art. VII, § 2(a), provides:
 Any one of the following—the chairman of the executive committee, the president of the medical staff, the chairman of a clinical department, the chief executive officer and the executive committee of either the medical staff or the governing body—shall each have the authority, whenever action must be taken immediately in the best interest of patient care in the hospital, to summarily suspend all or any portion of the clinical privileges of a practitioner, and such summary suspension shall become effective immediately upon imposition.

medical staff, the affected practitioner is entitled to a formal hearing before an *ad hoc* committee of the medical staff and an appeal from the committee's decision to the Board of Trustees. Only after completion of these procedures can the physician's privileges be reduced, suspended or revoked.

Section 2 allows summary suspension of staff privileges when such action is immediately necessary in the best interests of patient care. After summary suspension of privileges under this section, the affected practitioner may seek a hearing before the executive committee of the medical staff and, if the result of that hearing is unfavorable, may appeal it to the Board of Trustees.

McMillan's privileges were suspended on September 18, 1975, by Ernest Webb, the chief executive officer of the hospital. Webb sent a letter to McMillan's home informing him that Webb had summarily suspended his staff privileges pursuant to the provisions of article VII, section 2, of the medical staff bylaws. McMillan was out of the state taking board certification examinations at the time and did not receive the notice until September 29, 1975. The letter contained notification that McMillan was entitled to request a hearing by the executive committee of the medical staff within ten days of receipt of the notice.

Upon McMillan's request for a hearing, he was sent a letter notifying him that a hearing was set for October 9, 1975. The letter also notified him that the reason for the suspension was his disruptive behavior.[2] At McMillan's request the hearing date was postponed to November 5, 6 and 7, 1975. The hearing was held before an *ad hoc* committee. Two of the three members of that committee and the hearing officer were not affiliated with the hospital. The remaining committee member was a doctor on the medical staff. Both parties were represented by counsel. Witnesses were

sworn and McMillan had an opportunity to cross-examine the hospital's witnesses and to present witnesses in his own behalf.

At the hearing, the hospital made no claim that McMillan's suspension was related to medical incompetence. Instead, the hospital summarily suspended McMillan on the ground that his longstanding attitude and actions were continually disruptive of hospital operations, and that this disruption resulted in a diminished quality of overall patient care.

The charge of disruptiveness was based on a series of problems and incidents occurring from 1973 through 1975 between McMillan and the nursing staff, other staff physicians, a nurse anesthetist, and the relatives of several patients. The evidence presented at the hearing tended to establish that McMillan had a disruptive influence. McMillan himself acknowledged that he knew he had an abrasive effect on some people at the hospital. Webb and Dr. Ivy, the chief of staff, testified that because of the cooperation necessary among members of an operating room staff, disruptive activities such as these were not in the best interests of patient care. This conclusion was corroborated by other physicians who testified at the hearings. However, there was no claim by the hospital, nor was there any evidence given to support a claim, that McMillan's activities or conduct resulted in any immediate threat to a particular patient.

The hospital maintained that there was an immediate need to remove McMillan's staff privileges because it did not want him to return to the hospital after his absence in September 1975. Webb testified that things had gone well while McMillan was gone. He was concerned that operating room procedures would become materially worse than they were before McMillan left if the procedure outlined in article VII,

2. The notice stated that, according to Webb, "his action in suspending Dr. McMillan's privileges was based on numerous incidents showing clearly to him that the activities and professional conduct of Dr. McMillan were and continued to be disruptive of the operations of the

Hospital." The notice then went on to list alleged acts or omissions by McMillan which gave rise to the allegation that he had disrupted, and continued to disrupt, hospital operations.

section 1(a), of the bylaws was used, and McMillan was working in the operating room while the committee investigations were going on.[3] The chief of staff and the chief of surgery agreed with this assessment.

On November 14, 1975, the hearing committee unanimously upheld the suspension. McMillan appealed this decision to the Board of Trustees, which "affirmed the decision of the Hearing Committee in all respects" on June 10, 1976.

McMillan then filed a complaint in superior court, claiming that the action of the hospital in summarily suspending his privileges was a breach of contract (meaning a breach of the medical staff bylaws) and a violation of his procedural and substantive due process rights. He sought reinstatement and damages for both the breach of contract and the due process violations.

Upon stipulation of the parties (stipulation of June 3, 1977), it was agreed that the hearing before the superior court would be treated as an appeal from an administrative agency pursuant to former Appellate Rule 45. The questions for review were stipulated to be:

(1) whether the defendant [hospital] breached any applicable contract by its conduct alleged in the complaint and

(2) whether the defendant's conduct was arbitrary, capricious or unreasonable, or in violation of the principles of procedural due process.

If the court determined that McMillan was entitled to damages, the amount of damages would be decided at a jury trial "at which both parties [would be] entitled to present relevant evidence not limited to the record."[4]

3. Webb was asked why, if McMillan's disruptive behavior had gone on for over two years, Webb had not instituted suspension proceedings or summarily suspended McMillan sooner. He replied in part:

Well, several reasons. In 1974 when he went on vacation he'd given an ultimatum that if this nurse stayed he would not return. I thought he would keep his word. Was disappointed when he came back. He was still a member of the Clinic. We were still trying to work out the differences, and at times things were not in a constant high-level of irritation. There were highs and lows, and hoping that things would work out, that everything would get along fine, we went along with it. Another thing, it's sort of like having a burr under the saddle or a sore on your arm. You sort of get accustomed to it and it isn't until the burr is gone and the sore is relieved that you realize how damn good it feels without it, and that is sort of the case that occurred this Fall.

. . . .

And when I thought he was going to take his shingle someplace else and hang it up, I thought beautiful, we can get someone in here we can depend on. We can schedule our cases in advance and know that we are going to have coverage on those days to handle those patients and we'll do it all without a lot of hard feelings or a lot of irritation, and the day that I got this letter that he planned on being back to practice here I immediately sent the copy of the letter to him summarily suspending his privileges. This— the time that he was off anyway would not have caused him any loss of cases should we not be able to prove our case, and it felt so

damn good to have that burr gone from under the saddle that I felt that was the time and place to cut it off was when he was gone and we had coverage rather than waiting until he came back . . . .

Later Webb was asked:

Are you telling me that you had a continuing problem that went on and you finally decided that it would be pleasanter to get rid of it?
[Webb:] Yes.

4. The hospital initially claimed that it was a private hospital whose staffing decisions were not subject to judicial review. However, in the stipulation of June 3, 1977, the hospital waived this claim by agreeing to judicial review of McMillan's suspension as an appeal from an administrative agency according to former Appellate Rule 45. On appeal to this court, the hospital does not make any claim that its decisions are not subject to judicial review.

Cf. Storrs v. Lutheran Hosps. and Homes Soc'y, 609 P.2d 24, 28 (Alaska 1980), where we held that Fairbanks Memorial Hospital was a quasi-public hospital that could not violate due process standards in denying staff privileges. The hospital was found to be quasi-public "because it [was] the only hospital serving the community, the construction of the hospital was funded in significant part by state and federal grants, and over twenty-five percent of the funds received for hospital services [came] from governmental sources." Id.

It is not clear from the record whether Anchorage Community Hospital would have sufficient public funding contacts to meet the criteria mentioned in Storrs. It was not the only hospital operating in Anchorage at the time of

On May 17, 1978, the late Judge Kalamarides issued his memorandum of decision. He noted that McMillan's suspension hearing must conform to due process standards, and held that McMillan had been denied due process because the bias of the doctor who was one of the committee members had denied him a hearing before an impartial tribunal. On that basis, the superior court remanded McMillan's dismissal to the hospital for another hearing pursuant to the bylaws.

With respect to the contract issue, the superior court held that "the fundamental relationship existing between the hospital and its staff [was] one of contract." However, it held that the contract had not been breached by summary suspension. It concluded that the choice of a pre- or post-suspension hearing involved a factual determination by the administration of the hospital concerning "the best interest of patient care," and it declined "to set standards for situations in which pre- or post-suspension hearing should be the appropriate proceedings." On remand, the court left it up to the hospital to decide whether to hold the hearing in accordance with the pre- or post-suspension provisions.

Pursuant to the superior court's order, the second post-suspension hearing was held on September 6 and 7, 1978. The three members of the hearing committee and the hearing officer were all new, and none were connected with the hospital. McMillan was again given the opportunity for an evidentiary hearing with representation of counsel. The transcript of the first hearing was introduced into evidence in the second hearing. There were also two days of live testimony.

On September 12, 1978, the second committee unanimously upheld the summary suspension of McMillan's staff privileges. This decision was appealed to the Board of Trustees, which concluded on March 22, 1979, that the suspension was proper because the situation created by McMillan's disruptive behavior warranted summary action in the best interests of patient care.

After this decision, the hospital made a motion to the superior court that judgment be granted in its favor. McMillan opposed the motion, and filed a notice of appeal from the board's decision. His appeal made the following claims:

(1) Article VII, section 2 allows summary suspension only in an emergency requiring "immediate action in the best interest of patient care", and there is no evidence in the record to support summary suspension under this standard.

(2) The hospital's summary suspension of McMillan's staff privileges was arbitrary, capricious, unreasonable and contrary to principles of fundamental fairness and due process of law.

The hospital opposed this appeal, claiming that Judge Kalamarides had already considered the question of whether the bylaws authorized summary suspension in cases of disruptiveness, and had decided that this was a factual determination to be made by the hospital hearing committee.

Judge Eben Lewis allowed the appeal, and concluded that "the scope of the inquiry [on appeal] should comprehend both the question of good faith compliance by the hospital with the terms of the contract [bylaws] and that of substantive due process. Procedurally, Dr. McMillan [had] been accorded the essential elements of adjudicative due process."[5]

McMillan's suspension. The hospital building where McMillan enjoyed his staff privileges was not constructed with any public funds. McMillan attempted unsuccessfully to obtain hospital books and records that would indicate the percentage of funding, such as grants, revenue sharing and welfare payments, received from public sources. McMillan dropped this line of inquiry when the hospital agreed to the stipulation, which included review of the ques-

tion whether the hospital's action comported with the requirements of due process.

5. Judge Lewis discussed whether due process required a hearing prior to suspension. Relying on *Storrs v. Lutheran Hosps. & Homes Soc'y*, 609 P.2d 24 (Alaska 1980), and the quote therein from *Citta v. Delaware Valley Hosp.*, 313 F.Supp. 301 (E.D.Pa.1970), he decided that the balance of physician and hospital interests could justify suspension prior to hearing be-

Judge Lewis concluded that the summary suspension of McMillan was justified under both the bylaws and substantive due process requirements. Accordingly, he affirmed the decision of the Board of Trustees of the hospital. He awarded the hospital $15,000 in attorney's fees, but denied its request for costs. McMillan now appeals Judge Lewis' decision to this court. He disputes the propriety of summary suspension and also appeals the award of attorney's fees to the hospital. The hospital has filed a cross-appeal on the costs issue.

In its brief, the hospital discusses at some length the question of whether disruptiveness and inability to work with others can be legitimate grounds for suspension of staff privileges.[6] However, the issue here is not whether disruptiveness can be legitimate grounds for suspension. Clearly it can be. The medical staff bylaws list ability to work with others as one of the qualifications necessary for medical staff membership. Article VII, section 1, lists disruptiveness as one of the grounds for initiation of procedures against a physician holding staff privileges.

The issue on appeal is whether the circumstances leading to the charge of disruptiveness against McMillan were sufficient for *summary* suspension of his privileges. McMillan claims that, under the terms of the medical staff bylaws and the require-

ments of due process, summary suspension is only proper where there is some emergency or immediate need for suspension in the best interests of patient care. He maintains that the evidence presented against him does not meet that standard.

The medical staff bylaws provide for two distinct procedures for reduction or removal of staff privileges. The provisions of article VII, section 1, for investigation and hearing prior to suspension, apply whenever the activities or professional conduct of a staff physician are considered to be lower than the standards or aims of the medical staff or to be disruptive of the operations of the hospital. The article VII, section 2, summary suspension provisions, with a hearing after suspension, apply whenever action must be taken immediately in the best interests of patient care in the hospital.

The hospital seems to argue that the two procedures are interchangeable. McMillan, on the other hand, while not arguing that the two procedures are mutually exclusive, does maintain that the circumstances in which summary suspension is proper are more limited than those in which the pre-suspension hearing procedures are proper.

 Rules of contract interpretation apply to the construction of hospital bylaws. *Storrs v. Lutheran Hospitals & Homes Society*, 609 P.2d 24, 30 (Alaska 1980).[7] How-

cause there was sufficient evidence shown in the record to justify the action taken.

6. Most of the cases cited by the hospital involve denial of staff privileges or failure to reappoint a physician to staff privileges. Three cases cited involve suspension of staff privileges. In one of them, *Anderson v. Bd. of Trustees*, 10 Mich.App. 348, 159 N.W.2d 347 (1968), a hearing was held prior to the suspension. In another case, *North Broward Hosp. Dist. v. Mizell*, 148 So.2d 1 (Fla.1962), there does not appear to have been a hearing prior to suspension. The doctor was challenging as unconstitutionally vague the rule allowing summary suspension pursuant to which the board acted. Right to a hearing was not an issue in the case.

7. *Storrs* also held that a hospital must conform to its bylaws when suspending staff privileges. *Storrs*, 609 P.2d at 30. The hospital initially acknowledges this holding and claims to agree with it, but then goes on to argue that this

holding does not mean that a physician has a right to a particular hearing procedure provided for in the bylaws.

No doubt this claim is influenced by the fact that the hospital maintains there is no major difference in the protections provided by the two procedures or the circumstances in which they apply. However, as discussed in this opinion, § 2 does have a more limited application than § 1 and the limited circumstances in which it can be used will govern the hospital's choice of procedures when taking corrective action in conformance with the bylaws.

In any case, the decisions cited by the hospital as support for its argument that a physician cannot claim a right to a particular procedure are in direct conflict with the holding in *Storrs*. For example, *Weary v. Baylor Univ. Hosp.*, 360 S.W.2d 895, 897 (Tex.Civ.App.1962), held that a hospital need not conform to medical staff bylaws that it has approved and adopted.

ever, the court will only impose an interpretation on a contract when it is ambiguous; that is, when the contract as a whole and all extrinsic evidence support two different interpretations, both of which are reasonable. *Modern Construction, Inc. v. Barce, Inc.,* 556 P.2d 528, 529 (Alaska 1976).

The hospital's suggested interpretation of sections 1 and 2 as interchangeable is simply not a reasonable construction of the two bylaws. Given the plain wording of the sections, it is clear that article VII, section 2, is of more limited applicability than section 1. Pre-suspension hearing procedures can be started *whenever* competence or conduct of a physician is lower than medical staff standards or is disruptive of hospital operations, whereas summary suspension applies only when there is a need for *immediate* action in the best interests of patient care.

Recognizing that section 2 has a more limited scope than section 1, the issue is what circumstances will justify action under section 2. The bylaws are not at all clear on this question. McMillan argues that a need for immediate action in the best interests of patient care requires some showing of emergency or immediate threat to patient safety. The hospital disputes this interpretation, but never suggests what kind of showing must be made instead. Under article VII, section 2, of the bylaws, where summary suspension has been invoked by the hospital, the hospital has the initial task of designating the particular patient or patients whose care has been adversely affected by the action or inaction of the physician, in what manner and to what degree there has been adverse affect as to the patient's care, and what the physician's action or inaction consisted of. But once that has been done, the burden is then on the physician to establish that the hospital's decision was unjustified. It is clear that this is the case in proceedings before the hospital hearing committee,[8] and also in proceedings in the superior and supreme courts where the physician is designated, respectively, as the plaintiff and the appellant.

The parties have injected into this case the question of whether procedural due process rights of McMillan have been infringed upon or denied. This was done by way of a stipulation (referred to earlier in this opinion) where the hospital and McMillan agreed that the questions for review by the court were:

(1) whether the defendant [hospital] breached any applicable contract by its conduct alleged in the complaint and (2) whether the defendant's conduct was arbitrary, capricious or unreasonable, or in violation of the principles of procedural due process.

In *Storrs v. Lutheran Hospitals & Homes Society,* 609 P.2d 24, 28 (Alaska 1980), we held that a quasi-public hospital cannot violate due process standards in denying or revoking staff privileges. As previously discussed, note 4 *supra,* it is not clear from the record whether the hospital would qualify as a quasi-public hospital. However, the hospital stipulated to review of its actions to determine whether they comported with due process, and has conceded that its procedures must meet due process requirements.

"When principles of due process attach there is a certain level of procedural fairness that must be accorded to an affected party." *Nichols v. Eckert,* 504 P.2d 1359, 1364 (Alaska 1973). The minimum procedural guarantees which due process re-

8. Under the bylaws, McMillan had the burden of proof even in the proceedings before the hospital hearing committee. Art. VIII § 5(h) provides in part:

It shall be the obligation of such [hospital] representative to present appropriate evidence in support of the adverse recommendation or decision, but the affected practitioner shall thereafter be responsible for supporting his challenge to the adverse recommendation or decision by an appropriate showing that the charges or grounds involved lack any factual basis or that such basis or any action based thereon is either arbitrary, unreasonable or capricious.

A provision similar in effect to this one was upheld in *Anton v. San Antonio Community Hosp.,* 19 Cal.3d 802, 140 Cal.Rptr. 442, 567 P.2d 1162, 1177–78 (1977).

quires depend on the particular circumstances of a case. *Cafeteria & Restaurant Workers v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230, 1236 (1961); *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484, 494 (1972). However, "[t]hat the hearing required by due process ... is not fixed in form does not affect its root requirement that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest, except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." *Boddie v. Connecticut*, 401 U.S. 371, 378–79, 91 S.Ct. 780, 786, 28 L.Ed.2d 113, 119 (1971) (emphasis in original). *See also Board of Regents v. Roth*, 408 U.S. 564, 569–70, n.7, 92 S.Ct. 2701, 2705 n.7, 33 L.Ed.2d 548, 556 n.7 (1972); *Bell v. Burson*, 402 U.S. 535, 542, 91 S.Ct. 1586, 1591, 29 L.Ed.2d 90, 96 (1971); *Nichols v. Eckert*, 504 P.2d at 1366 (concurring opinion).

■ In determining the validity of a summary suspension, "[t]he test is a strict one: a pre-discharge hearing is constitutionally dispensable only if the employer's [hospital's] interest is important and significantly outweighs the possible injury to the employee's [physician's] interests." *Commonwealth of Pennsylvania ex rel. Rafferty v. Philadelphia Psychiatric Center*, 356 F.Supp. 500, 510 (E.D.Pa.1973) (citations omitted).

The interest of a physician in staff privileges is an important one. The California Supreme Court discussed this interest in *Anton v. San Antonio Community Hospital*, 19 Cal.3d 802, 140 Cal.Rptr. 442, 454, 567 P.2d 1162, 1174 (Cal.1977):

"Although the term 'hospital privileges' connotes personal activity and personal rights may be incidentally involved in the exercise of these privileges, the essential nature of a qualified physician's right to use the facilities of a hospital is a property interest which directly relates to the pursuit of his livelihood." [*Quoting Edwards v. Fresno Community Hospital*, 38 Cal.App.3d 702, 113 Cal.Rptr. 579, 580 (1974).]

. . . .

[I]t is clear to us that the admission of a physician to medical staff membership establishes a relationship between physician and hospital which, although formally limited in duration ..., gives rise to rights and obligations .... [9]

Summary deprivation of this right amounts to a stigma of medical incompetence. It clearly affects the doctor's ability to maintain his income during the period of time between suspension and a hearing and, because of the loss of reputation attendant to a summary suspension, may affect his earning capacity subsequent to the hearing.[10]

On the other side, the hospital's interest is also a strong one. As the court stated in *Citta v. Delaware Valley Hospital*, 313 F.Supp. 301, 309 (E.D.Pa.1970):

[A] hospital has an overwhelming interest in maintaining the highest standards of medical care for its patients. This interest stems not only from the practicalities of insurance coverage and the limitation of potential liability but also results from the undoubted concern of all professionals who administer the hospital's dispensing of services that they provide the finest possible care for all patients. Patient

9. *Accord, Stretten v. Wadsworth Veterans Hosp.*, 537 F.2d 361, 366–67 (9th Cir. 1976) (physician has property interest in residency at hospital).

10. *Accord, Stretten v. Wadsworth Veterans Hosp.*, 537 F.2d at 368 (doctor's interest in keeping position is to maintain his income and protect his reputation); *Commonwealth of Pa. ex rel. Rafferty v. Philadelphia Psychiatric Center*, 356 F.Supp. 500, 510 (E.D.Pa.1973) (psychiatric nurse has important interest in avoiding

loss of means of livelihood and damage to reputation). *Cf. Nichols v. Eckert*, 504 P.2d 1359, 1366 (Alaska 1973) (concurring opinion) (summary discharge or suspension of a teacher may cause economic hardship and create a stigma of incompetence). As noted in *Rafferty*, 356 F.Supp. at 510, "Courts have been especially reluctant to relax the requirements of procedural due process when a loss of the means of support is threatened." (citations omitted)

care and the administration of the procedures necessary to maintain high quality care is an extremely important interest.

More particularly, the hospital has a very strong interest in insuring the professional competence of the physicians who hold staff privileges at its facilities.

The survival of patients often depends upon the presence of competent physicians. The interest of the hospital in enlarging the prospects of survival of patients weighs in favor of due process procedures which will minimize the risk of continued employment of an incompetent doctor, so long as these procedures are consistent with notions of fundamental fairness.

*Stretten v. Wadsworth Veterans Hospital,* 537 F.2d 361, 368 (9th Cir. 1976).

The hospital also has an interest in making sure that the physicians on staff possess the ability to work well with other members of the hospital staff.

A hospital staff is highly interdependent, both in the sense that one doctor depends upon the professional skill of other doctors and in the sense that the collegial nature of the body makes tolerable working relationships an absolute prerequisite to effective staff performance. The necessity for a healthy working relationship is a function of the nature of the work to be done. Incompatible workers on farms, ranches, or in certain types of factories can function reasonably well although even there it is doubtful that full efficiency is achieved. Effective performance by physicians on the staff of a hospital, whose tasks require a high degree of cooperation, concentration, creativity, and the constant exercise of professional judgment, requires a greater degree of compatibility. The Hospital must recognize this necessity. This enhances its interest in quickly dealing with incompetence and debilitating personal frictions.

*Stretten v. Wadsworth Veterans Hospital,* 537 F.2d at 368.[11] *See also* Note, *Hospital Staff Privileges: The Need for Legislation,* 17 Stanford L.Rev. 900, 905 (1965).

Of the two interests—professional competence and ability to work with others—the hospital clearly has a stronger interest in being able to act quickly to protect patients from professional incompetence. Where a physician's competence has been called into question, the risk to patient safety is obvious and immediate. In such situations, courts have uniformly held that the hospital's interest outweighs the physician's, and that summary suspension is justified.[12]

Where the physician is simply charged with disruptiveness or an inability to work with others, the risk to patients is not so obvious or immediate. But if it appears that a physician's conduct is of a type which poses a realistic or recognizable threat to patient care, then immediate removal or summary suspension of the physician's hospital privileges would be justified. The fact that the physician's conduct has not yet produced any harm to a patient may be relevant in ascertaining whether his actions pose any such threat. But this is not an

11. In *Stretten*, a doctor was dismissed from a residency program for "unsatisfactory performance and 'other considerations.'" 537 F.2d at 363. After balancing all of the various interests involved, the court held that the doctor was entitled to a hearing prior to dismissal from the residency program, but that a full evidentiary hearing was not required. *Id.* at 369.

12. *See Citta v. Delaware Valley Hosp.,* 313 F.Supp. 301, 309–10 (E.D.Pa.1970) (right to perform gastrectomies suspended following death of patient); *Storrs v. Lutheran Hosps. & Homes Soc'y,* 609 P.2d 24, 31 (Alaska 1980) (privileges suspended following death of one of the physician's patients from post-operative complications); *Duby v. Baron,* 369 Mass. 614, 341 N.E.2d 870, 874 (1976) (privileges suspended following unusual surgical complications four days before doctor was scheduled to perform same procedure on another patient). *Cf. Scappatura v. Baptist Hosp.,* 120 Ariz. 204, 584 P.2d 1195 (App.1978) (summary suspension of staff privileges did not violate bylaws of private hospital where doctor scheduled to perform procedure identical to one that resulted in death only one week before); *Colorado St. Bd. of Medical Examiners v. Dist. Ct.,* 191 Colo. 158, 551 P.2d 194, 196 (1976) (medical license suspended where mental disability rendered physician unable to perform medical services with reasonable skill and safety to patient).

absolute prerequisite to the summary suspension of the physician's hospital privileges. A hospital is not required to wait until the physician's conduct has resulted in harm to a patient before summary action may be taken.

In light of these considerations, we hold that when suspension of a physician's staff privileges is based on a charge of disruptiveness or inability to work with others, and there is no related charge concerning medical competence, summary suspension of the privileges is justified only where there is evidence that a physician's conduct poses a realistic or recognizable threat to patient care which would require immediate action by the hospital. The existence of such evidence is particularly important because there is no pre-suspension investigation period or informal hearing procedure which might give the physician an opportunity to respond to the charges against him.

Using this standard, we believe that summary suspension of McMillan's privileges was not justified under the bylaws and the facts of this case. In other words, McMillan has established that the evidence did not justify his summary suspension. The hospital conceded at trial that McMillan's suspension was not based on any challenge to or question of his professional competence. While a pattern of disruptive behavior was established, it was not clear that this behavior adversely affected patient care, or that immediate action by summary suspension was necessary. The only statements made concerning the effect of McMillan's actions were general statements by Webb and Ivy to the effect that the disruptive behavior with which McMillan was charged was not in the best interests of patient care.

The disruption of the operating room nursing staff seems to be the most serious charge levied against McMillan. The operating room nurse supervisor did indicate at one point that the nurses could not concentrate on the patients because they were so worried about what McMillan would do next. Even here, however, it does not appear that McMillan's conduct posed any imminent threat to patient care. The nurse supervisor and Webb both conceded that the operating room problems were not as acute in the fall of 1975 as they had been in 1973 and 1974, thus raising questions as to the immediacy of this problem.

The incidents which occurred immediately prior to McMillan's suspension were scheduling disruptions caused by McMillan during the medical malpractice crisis, a conversation with a nurse anesthetist during which McMillan suggested that the nurse anesthetist should think twice before coming to work at the hospital, and a heated encounter with another nurse supervisor. There is absolutely no evidence indicating that any of these incidents resulted in adverse patient care.

The reasons which the hospital gave for taking immediate action also do not justify summary suspension. A desire to avoid the burden of the more time consuming section 1 proceedings is not sufficient justification. The claim that operating room conditions would become materially worse upon McMillan's return is also insufficient justification, because it does not appear that McMillan's prior actions had resulted in any imminent threat to or actual adverse impact on patient care. We conclude that McMillan has established that the evidence did not justify his summary suspension.

In spite of all its protestations that McMillan's activities were not in the best interests of patient care, the hospital's reasons seem to have more to do with wanting to get rid of "a burr under the saddle" or a "personality that [would] not change", than they do with concerns for patient care. Even giving extreme deference to the hospital's need to act quickly in the best interests of patient care, this is not sufficient justification for summary suspension.

As relief for the failure of the hospital to conform to its bylaws, McMillan seeks reinstatement of his staff privileges and a remand to the superior court for a hearing on damages. We conclude that the facts adduced at the second hearing, and the procedural due process afforded McMillan

at that hearing and subsequent appeal to the Board, were sufficient to support a post-hearing suspension of his privileges even though they were not sufficient to support summary suspension. The *ad hoc* committee was impartial, and McMillan was given ample opportunity to confront witnesses against him and to present evidence in his own behalf. The evidence presented at the hearing showed a longstanding pattern of behavior by McMillan which, while not clearly resulting in adverse patient care, was disruptive of the operations of the hospital. Reinstatement of McMillan's staff privileges is therefore not necessary.[13]

 We remand the case for a determination of damages. The proper measure of damages is Dr. McMillan's loss of income, minus any mitigation of damages, from the date of the summary suspension up to the proper suspension following the second hearing.[14]

 Because the decision of the superior court is reversed, we need not consider the propriety of the attorney's fees and costs awarded. We do note, however, that on remand the court cannot properly make an award for costs and fees incurred during the proceedings before the hospital committee. Former Appellate Rule 29[15] applies to superior court hearings on hospital staffing decisions to the extent that such hearings involve appeals from administrative decisions. *Storrs v. Lutheran Hospitals & Homes Society*, 609 P.2d at 31 n.22. By stipulation of both parties in this case, the hearing before the superior court was treated as an appeal from an administrative agency.

Former Appellate Rule 29 serves to award costs and attorney's fees to the prevailing party for the proceedings *on appeal*, see *State v. Salzwedel*, 596 P.2d 17, 19 (Alaska 1979). But it does not serve as a basis for setting or recalculating fees in the proceeding from which appeal is taken. The medical staff bylaws, under which McMillan's hearings and appeals to the Board of Trustees were conducted, do not provide for an award of costs or attorney's fees to the prevailing party. This is the case even though the hearing committee, in its discretion, may permit representation by counsel before the *ad hoc* committee. There is therefore no basis for an award of attorney's fees incurred during the hospital proceedings.[16]

REVERSED and REMANDED to the superior court for further proceedings consistent with this opinion.

MATTHEWS, J., not participating.

---

**13.** Implicit here is a conclusion that there need not always be evidence of a clear connection between disruptive conduct and any immediate threat to patient care in order to justify suspension of staff privileges on the basis of disruptive conduct. As the court stated in *Stretten v. Wadsworth Veterans Hosp.*, 537 F.2d 361, 368 (9th Cir. 1976), "The necessity for a healthy working relationship is a function of the nature of the work to be done." In the hospital setting, particularly in the operating room, the nature of the work is of sufficient sensitivity and importance that a *post-hearing* suspension of staff privileges may be justified even without

the existence of facts indicating a clear connection between the disruptive activity charged and adverse patient care.

**14.** Dr. McMillan is not permitted recovery for injury to his reputation. *Skagway City School Bd. v. Davis*, 543 P.2d 218, 225 (Alaska 1975).

**15.** Former Appellate Rule 29 is now Appellate Rule 508.

**16.** *See also Klinge v. Lutheran Charities Ass'n*, 523 F.2d 56, 64 (8th Cir. 1975); *State v. Smith*, 593 P.2d 625, 630–31 (Alaska 1979).