**Ernest Leon CLEMONS,**
**Plaintiff-Appellant,**

v.

**DOUGHERTY COUNTY, GEORGIA, et al., Defendants-Appellees.**

**No. 81–7536.**

United States Court of Appeals,
Eleventh Circuit.

Sept. 7, 1982.

Sinnreich & Francisco, Elizabeth R. Francisco, Elizabeth Ballou Gibbs, Macon, Ga., for plaintiff-appellant.

C. Nathan Davis, Eugene C. Black, Sr., Albany, Ga., for defendants-appellees.

Before TUTTLE, TJOFLAT and CLARK, Circuit Judges.

TJOFLAT, Circuit Judge:

Ernest Leon Clemons, formerly a sergeant in the Police Department of Dougherty County, Georgia, brought this action under 42 U.S.C. § 1983 against Dougherty County, the Dougherty County Chief of Police, and five of the seven members of the County Board of Commissioners. He alleged that his discharge from the police department, which was ordered by the Chief and approved by a majority of the Board of Commissioners,[1] was impermissibly based on his exercise of his first amendment right to freedom of speech and deprived him of liberty[2] without due process in violation of the fourteenth amendment. After the parties had conducted substantial

---

1. The five Commissioners who are defendants in this case are those who voted to uphold Clemons' discharge.

2. Clemons also alleged that his discharge constituted a deprivation of property without due process. As he has since conceded that he had no property interest in his position, this claim is no longer at issue.

discovery, the defendants moved for summary judgment. The district court granted the motion and ordered the entry of judgment accordingly. We reverse.

## I.

Although many of the facts are in dispute, this much is uncontested: Ernest Leon Clemons was hired as a patrolman by the Dougherty County Police Department in August 1969. In 1974, he was promoted to sergeant. In the same year, Sigmund "Swede" Hansen joined the department as Assistant Chief; he became Chief of Police in 1975. Chief Hansen subsequently had occasion to record in Clemons' personnel file a number of warnings, reprimands, and other notations of perceived deficiencies in Clemons' performance. At no time, however, was Clemons placed on probationary status or threatened with dismissal.

In February and March of 1979, the three-member Public Safety Committee (PSC) of the Dougherty County Board of Commissioners (the Board) conducted an investigation into morale problems in the police department. The investigation consisted of individual interviews with each of the approximately forty members of the department, excluding the Chief. The policemen were urged to express openly their concerns about the department, and were assured that none of their comments would ever be attributed to them individually.

When Clemons was interviewed, he was critical of Chief Hansen. He indicated that his troubles with Hansen had begun in February 1977, when the Chief cursed him for saying Hansen was incapable of running the department. He complained that Hansen had a case he had worked on nol prossed for political reasons. He asserted that Hansen frequently violated the department regulation against cursing. He complained that Hansen had removed him from the Traffic Division with inadequate justification. In addition, Clemons offered criticisms of the department which did not expressly refer to Chief Hansen. He stated, for example, that a standby investigator whom he had once called in on a case had arrived on the scene inebriated.

From the interviews, the chairman of the PSC extracted 106 complaints and criticisms of the department. Although individual officers were the subject of some complaints, Clemons was not cited as a problem. Based in significant part on the chairman's list, the PSC, on approximately March 14, 1979, issued a report critical of the police department. The report and the list were presented to Chief Hansen. The Chief publicly threatened to resign, but was dissuaded.

On March 27, 1979, Chief Hansen called Clemons into his office, informed him that he was discharged, and handed him a letter of termination. The letter ascribed Clemons' termination to his continual creation of dissension and disturbance; obstinate attitude and general lack of respect; mistreatment of junior officers; slander of fellow officers and superior officers and their families; unprofessional conduct; need for continual supervision; failure to volunteer extra effort; provocation of junior officers into violation of the department's rules and regulations; constant bickering and arguing with neighbors; and bad judgment as a seasoned officer. Clemons was the only Dougherty County policeman discharged during this period.

Clemons requested and was granted a hearing before the Dougherty County Board of Commissioners. Most of what transpired at the hearing is disputed. The witnesses whose depositions were taken in this action disagree, for example, even as to how many hearings there were: Clemons' former counsel vividly recalls two hearings, and a third session at which the Board's decision was announced; of the five commissioners who were deposed, some recall one hearing and then another session at which the decision was announced, while others recollect that there was one hearing, at the end of which a decision was announced.

In however many sessions, Clemons, represented by counsel, did appear before the Board to challenge his discharge. Chief Hansen, relying principally on the information in Clemons' personnel file, defended his decision. Clemons' attorney questioned

Hansen, and Clemons made some remarks to the Board. A neighbor of Clemons spoke on his behalf. The Board decided to uphold the Chief's decision to discharge Clemons.

At some point after March 27, 1979, Chief Hansen notified Police Officers Standards and Training Council (POST) of Clemons' discharge. POST subsequently revoked Clemons' certification, rendering him ineligible to be a policeman in the State of Georgia.

Clemons thereafter filed his complaint in the district court, alleging that he was discharged because of his criticisms of Chief Hansen during his interview by the Public Safety Committee. Since those criticisms were protected by the first amendment, he claimed, his discharge was unlawful. Second, alleging procedural defects in his appearance before the Board of Commissioners, Clemons claimed that his discharge, which was attended by stigmatizing damage to his reputation and decertification by POST, constituted a deprivation of liberty without due process.

### II.

To prevail on his first amendment claim, Clemons must establish that his comments to the Public Safety Commission were constitutionally protected and were a substantial or motivating factor in his dismissal. Should he carry that burden, the defendants must show that they would have discharged him even in the absence of the protected conduct. *Mt. Healthy City School Dist. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Van Ooteghem v. Gray*, 628 F.2d 488, 491 (5th Cir. 1980), *cert. denied*, —— U.S. ——, 102 S.Ct. 1255, 71 L.Ed.2d 447 (1982). The district court, applying the criteria of *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), concluded that

Clemons' remarks to the PSC were within the ambit of the first amendment.[3] The appellees do not urge on appeal that Clemons' statements were not constitutionally protected, and, viewing the facts in light of *Pickering*, we find no reason to disturb the district court's finding for purposes of summary judgment that they were. The court went on to find, though, that there was no evidence to permit the inference that Clemons' comments to the PSC were a substantial factor in his discharge and, alternatively, that the record made clear that Clemons would have been discharged even if he had not spoken. Therefore, the court granted the defendants' motion for summary judgment on the first amendment claim.

Summary judgment should be entered only if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *See Impossible Electronics Techniques, Inc. v. Wackenhut Protective Systems, Inc.*, 669 F.2d 1026, 1030 (5th Cir. 1982). In reviewing a decision granting or denying summary judgment, this court applies the same legal standards as those that control the district court in determining whether summary judgment is appropriate. *Environmental Defense Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981); *United States Steel Corp. v. Darby*, 516 F.2d 961, 963 (5th Cir. 1975).

The party seeking summary judgment bears the exacting burden of demonstrating that there is no genuine dispute as to any material fact in the case. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Marsh*, 651 F.2d at 990–91. In assessing whether the movant has met this burden, the courts should view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. *Adickes*, 398 U.S. at 157, 90 S.Ct. at 1608;

---

**3.** The district court did not expressly rule on whether Clemons' remarks were protected. Its conclusion that they were, however, can be inferred from the pertinent portion of its order: "Plaintiff Clemons' position rests upon an assumption he was fired for statements he made before a committee investigating possible morale problems in the Dougherty County Police Department.... [T]he court has employed the complex balancing test mandated by [*Pickering*] and its progeny. This court has carefully considered the entire record and finds as a matter of law there was no such violation. There is absolutely no evidence or inference ... that Plaintiff Clemons' statements to the committee in question were a substantial factor in his termination."

*Marsh*, 651 F.2d at 991. All reasonable doubts about the facts should be resolved in favor of the non-movant. *Casey Enterprises v. Am. Hardware Mutual Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981). If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial. *Marsh*, 651 F.2d at 991; *Lighting Fixture & Elec. Supply Co. v. Continental Ins. Co.*, 420 F.2d 1211, 1213 (5th Cir. 1969). Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts. *Lighting Fixture & Elec. Supply Co.*, 420 F.2d at 1213. If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment. *Impossible Electronics*, 669 F.2d at 1031; *Croley v. Matson Navigation Co.*, 434 F.2d 73, 75 (5th Cir. 1970).

Moreover, the party opposing a motion for summary judgment need not respond to it with any affidavits or other evidence unless and until the movant has properly supported the motion with sufficient evidence. *Adickes v. S. H. Kress & Co.*, 398 U.S. at 160, 90 S.Ct. at 1609–10; *Marsh*, 651 F.2d at 991. The moving party must demonstrate that the facts underlying all the relevant legal questions raised by the pleadings or otherwise are not in dispute, or else summary judgment will be denied notwithstanding that the non-moving party has introduced no evidence whatsoever. *Brunswick Corp. v. Vineberg*, 370 F.2d 605, 611–12 (5th Cir. 1967). *See Dalke v. Upjohn Co.*, 555 F.2d 245, 248–49 (9th Cir. 1977).

■ Applying these standards to the record in this case, we conclude that the district court erred by granting the defendants' motion for summary judgment on Clemons' first amendment claim. First, contrary to the district court, we find that the record, consisting of the pleadings, Clemons' affidavit, and depositions of Clemons, Hansen, the five defendant Commissioners, and Clemons' former counsel, allows the inference that Clemons' statements to the PSC were a motivating factor in Hansen's decision to discharge him.[4]

The record permits the following view of the facts: During his interview by the PSC, Clemons was highly critical of Chief Hansen, so much so that one of the committee members commented at the end of the interview that Clemons had given them quite an earful. From Clemons' and the other interviews, the chairman of the PSC compiled a list of 106 complaints and concerns. This list, along with the PSC's report based on the interviews, was shown to Chief Hansen on approximately March 14, 1979.

Although the items on the PSC chairman's list were not explicitly attributed to the officers who contributed them, Chief Hansen was able to identify Clemons as the source of several of them. One item on the list, for example, stated, "Chief had case against John Hill (works for Bubba Pippin) nol prossed." Since Clemons was the only policeman who had been involved in the case against John Hill, Hansen could identify Clemons as the source of that complaint. Another item on the list stated, "If investigator is on standby, shouldn't consume any alcoholic beverages." This comment likewise could be attributed to Clemons, because he had complained to Hansen that he had called in an investigator on standby who showed signs of having imbibed.[5]

4. Although the Commissioners seem to agree that the Chief had the authority to hire and fire and the Board to review his employment decisions, the record leaves unclear who had the ultimate authority to discharge policemen in Dougherty County; nor do the parties address this matter in their briefs. Depending on where the ultimate authority resided, either Chief Hansen or the Commissioners may have a defense to Clemons' first amendment claim. On the uncertain record before us, we must leave this concern for the district court on remand, and assume for purposes of review that the Chief and the Commissioners had joint responsibility for the decision to discharge Clemons.

5. The record also contains intimations that one member of the PSC revealed to Hansen the substance of some of the interviews. These intimations, however, are in the form of hearsay. Because the evidence cited in the text suffices to support the inference that Hansen knew that Clemons had criticized him to the PSC, and because the admissibility of evidence on a motion for summary judgment is generally

Unhappy with the criticism of his department, Chief Hansen publicly threatened to resign. Indeed, he submitted a letter of resignation, which he withdrew only after the Board of Commissioners reaffirmed that it would support him as chief operating officer of the police department.

Shortly after being shown the PSC's list of complaints and report, Chief Hansen asked the Board whether he still had the authority to fire; the Board assured him he did. Approximately two weeks later, Hansen summoned Clemons to his office and told him that the investigation was over and that he was fired. Shortly thereafter, Hansen reprimanded several other policemen for criticizing the department to outsiders. The reprimands, as one Commissioner acknowledges, were inspired by the officers' remarks to the PSC.

Particularly telling is the defendants' inability to identify any precipitating cause for Clemons' discharge other than his interview with the PSC. The defendants' recollections of the reasons for the termination are notably inconsistent. Commissioner Barrett recalls that Chief Hansen told him before Clemons' appeal to the Board of Commissioners that the event that triggered the discharge was an altercation between Clemons and an officer named Pittman.[6] Commissioner Gambrell recalls from the hearing itself that although Clemons' personnel file revealed a number of deficiencies over the years, the incident that precipitated his discharge was a scuffle with another officer. But that scuffle could not have been the Pittman incident, he recalls, because the Pittman incident occurred many months before Clemons' termination.

Commissioner Underwood is confident that the Pittman incident could not have precipitated Clemons' discharge, because it occurred two years previously and had been dealt with at the time. He recalls that the dominant reason for the discharge was a property dispute between Clemons and his neighbor, Walker, in which Clemons blocked a county road with lumber.

Chief Hansen insists that the straw that broke the camel's back was that Clemons improperly used police investigatory facilities to check on Walker's criminal record shortly before the termination decision. Commissioner Barrett, however, has no recollection of the Walker matter being mentioned at Clemons' hearing. Furthermore, Commissioner Underwood recalls that at the hearing, he was troubled by the lack of any grievance of recent vintage against Clemons. Finally, the attorney who represented Clemons before the Board is certain that Clemons' investigation of Walker was not mentioned at the hearing; he recalls that what Hansen presented as the last straw was Clemons telling Walker's son not to trespass on his land any more.

In summary, the circumstances surrounding Clemons' discharge permit the inference that Chief Hansen knew Clemons had complained about him to the PSC and fired him for that reason. Particularly in light of the movants' failure to identify a precipitating cause for Clemons' discharge, the movants have failed to carry their burden to demonstrate that there is no dispute as to any material fact relating to the first amendment claim.

The district court held in the alternative that even if Clemons' statements to the PSC were a motivating factor in his discharge, his employment would have been terminated even if the interview had never occurred. Although the record is replete with evidence of reasons for which Clemons *might* have been discharged, once we accept for purposes of summary judgment that Clemons' protected speech was a motivating factor in his discharge, the record does not justify the inference the district court made. There is virtually no evidence in the

subject to the evidentiary rules relating to form and admissibility at trial, *Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 556 (5th Cir. 1980), *cert. denied*, 454 U.S. 927, 102 S.Ct. 427, 70 L.Ed.2d 236 (1981); *Munoz v. Int'l Alliance of Theatrical Stage Employees and Moving Picture Machine Operators*, 563 F.2d

205, 207 n.1, 213 (5th Cir. 1977), we do not consider the hearsay evidence.

6. Hansen denies having discussed any aspect of Clemons' discharge with any of the Commissioners before Clemons' appearance before the Board.

record to suggest, let alone to place beyond dispute, that Clemons would have been discharged for permissible reasons alone. Therefore, we reverse the district court's order granting summary judgment to the defendants on Clemons' first amendment claim.

## III.

Because Clemons' discharge, standing alone, was not such a blight upon his good name, reputation, honor, or integrity as to constitute a deprivation of liberty, his mere discharge—whether for no reason or for permissible reasons—did not implicate the due process requirements of the fourteenth amendment. *See Dennis v. S. & S. Consolidated Rural High School Dist.*, 577 F.2d 338, 340 (5th Cir. 1978); *Kaprelian v. Texas Woman's University*, 509 F.2d 133, 139 (5th Cir. 1975). To prevail on his fourteenth amendment claim, Clemons must first establish that his termination was attended by stigmatizing charges which "might seriously damage his standing and associations in his community" or foreclose "his freedom to take advantage of other employment opportunities." *Dennis*, 577 F.2d at 342–3; *see Board of Regents v. Roth*, 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972) (dictum). If he so establishes, he must show that he was deprived of the due process hearing to refute the charges to which he was then entitled.[7] *Dennis*, 577 F.2d at 343, 344.

## A.

■ It is undisputed that in connection with his termination, Clemons was the subject of at least potentially stigmatizing charges. He was accused of creating dissension and disturbance within the department, obstinacy and disrespect for his superiors, slander, hostile relations with his colleagues and neighbors, provoking fights, and unlawfully using police facilities to investigate a neighbor's criminal record for personal reasons. The district court, however, held that Clemons was not entitled to a due process hearing on the charges because the required stigma must involve dishonesty or immorality rather than such mere accusations of inability to get along with others as it concluded were involved in this case. For this distinction, the district court relied on two cases, neither of which supports its holding.

The court asserted first that the Supreme Court in *Board of Regents v. Roth, supra*, distinguished between a stigma such as dishonesty or immorality and a charge of inability to get along with others, holding that the former implicated due process liberty interests while the latter did not. *Roth* made no such distinction. In *Roth*, which held that the nonrenewal of an untenured instructor's contract did not, without more, require a due process hearing, the Court stated:

> There might be cases in which a State refused to re-employ a person under such circumstances that interests in liberty would be implicated. But this is not such a case.
>
> The State, in declining to rehire the respondent, did not make any charge against him that might seriously damage his standing and associations in his community. *It did not base the nonrenewal of his contract on a charge, for example, that he had been guilty of dishonesty or immorality.* Had it done so, this would be a different case. For "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential...."

Similarly, there is no suggestion that the State, in declining to re-employ the respondent, imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employ-

---

7. If Clemons should prevail at trial on his fourteenth amendment claim, he will be entitled to a hearing at which he may attempt to refute the stigmatizing charges. He will not, however, be entitled to reinstatement or back pay. The purpose of the due process hearing which Clemons claims he was denied was "not to afford an opportunity to recapture his previous employment but simply to 'clear his name.'" *Dennis*, 577 F.2d at 344, *quoting Board of Regents v. Roth*, 408 U.S. at 573 n.12, 92 S.Ct. at 2707 n.12.

ment opportunities.... Had it done so, this again would be a different case. 408 U.S. at 573–4, 92 S.Ct. at 2707 (citation omitted) (emphasis added).

The district court apparently read the italicized language as an exhaustive definition of the sorts of charges that might seriously damage a discharged employee's standing and associations in his community. On the contrary, the reference to a ·charge of dishonesty or immorality was obviously intended as an example, and not as a limitation on the kind of charges that might implicate liberty interests. Although the *Roth* dictum would limit such charges to those that might seriously damage one's standing and associations in the community or foreclose his freedom to take advantage of other employment opportunities, the case contains no further limitation on the sort of accusations that will suffice.

The district court also cited *Collins v. Wolfson*, 498 F.2d 1100 (5th Cir. 1974), in support of its distinction between immorality or dishonesty and other kinds of stigma. *Collins* does not even arguably support the distinction. In *Collins*, a nontenured college instructor challenged the termination of his employment, claiming that the failure to renew his contract so stigmatized him as to abridge his fourteenth amendment liberty interests. Acknowledging that the Supreme Court had indicated in *Roth* that charging an individual with dishonesty or immorality would require ·procedural protections, this court rejected the instructor's fourteenth amendment claim on the ground that "The precise reason for the trustees' failing to renew [his] contract was not any alleged wrongdoing on his part but simply that someone on the faculty had to go because of a necessary reduction in staff size.... There is simply no 'stigma' or 'badge of infamy' associated with this sort of nonrenewal." *Id.* at 1103. The case made no distinction whatever between charges of dishonesty or immorality and other sorts of accusations.

In short, neither *Roth*, nor *Collins*, nor any other authority which is binding on us, imposes any limitation on the stigmatizing charges which, in combination with a dis-

charge from public employment, implicate fourteenth amendment concerns. If anything, our precedents implicitly reject the distinction drawn by the district court. In *Robison v. Wichita Falls & North Texas Community Action Corp.*, 507 F.2d 245 (5th Cir. 1975), we said, "Employees discharged from public employment are not categorically entitled to a pre-termination hearing. A hearing is constitutionally required, however, when the stated reason for a public employee's discharge is an allegation that he is guilty of immoral or dishonest conduct *or other behavior that might tend to stigmatize him or to lower his standing in the eyes of the community.*" *Id.* at 251 (dictum) (emphasis added).

The Court of Appeals for the Ninth Circuit has held that the *Roth* notion of liberty distinguishes between a stigma of moral turpitude, which infringes the liberty interest, and a charge of incompetence or inability to get along with co-workers, which does not. *Stretten v. Wadsworth Veterans Hospital*, 537 F.2d 361, 365–66 (9th Cir. 1976); *Gray v. Union County Intermediate Educ. Dist.*, 520 F.2d 803, 806 (9th Cir. 1975); *Jablon v. Trustees of California State Colleges*, 482 F.2d 997, 1000 (9th Cir. 1973), cert. denied, 414 U.S. 1163, 94 S.Ct. 926, 39 L.Ed.2d 116 (1974). In *Stretten*, the court explained the distinction:

In the context of *Roth*-type cases, a charge which infringes one's liberty can be characterized as an accusation or label given the individual by his employer which belittles his worth and dignity as an individual and, as a consequence is likely to have severe repercussions *outside* of professional life. Liberty is not infringed by a label of incompetence, the repercussions of which primarily affect professional life.... [I]mplicit in such a distinction is the notion that the constitutional need for procedural protection is not strong when the charge (e.g., incompetence) involves a matter which is peculiarly within the scope of employer-employee relations and when the likely results of even a false charge are reduced economic returns and diminished prestige, but not permanent exclusion from, or

protracted interruption of, gainful employment within the trade or profession. 537 F.2d at 366.

Although the distinction drawn by the Ninth Circuit bears a rough resemblance to the distinction drawn by the district court, it would not, even if we were to adopt it, justify the district court's summary judgment on Clemons' fourteenth amendment claim. Among the charges leveled at Clemons, at least the accusations that he maintained hostile relations with his neighbors, provoked fights, and improperly used police facilities to investigate a neighbor's criminal record would be within the ambit of fourteenth amendment protection recognized by the Ninth Circuit. This case thus does not require us to decide whether to join the Ninth Circuit in holding that a mere charge of incompetence or inability to get along with one's co-workers in connection with a discharge from employment does not infringe fourteenth amendment liberty interests.

In the posture in which we find this case, we decline to impose any limitation on the charges which will implicate fourteenth amendment concerns beyond the settled requirement that they threaten serious damage to one's standing and associations in the community or foreclose his freedom to take advantage of other employment opportunities. There is, at least, a fact issue whether the accusations against Clemons were of such a nature, and the district court therefore erred in granting summary judgment on the ground that they were not.

Correctly observing that liberty interests are implicated only when potentially stigmatizing charges are publicly disclosed, *Bishop v. Wood*, 426 U.S. 341, 348, 96 S.Ct. 2074, 2079, 48 L.Ed.2d 684 (1976); *Dennis v. S. & S. Consolidated Rural High School Dist.*, 577 F.2d 338 (5th Cir. 1978), the defendants contend that the accusations against Clemons were not communicated to

the public. The record compels the conclusion that whether the charges were publicly aired is a disputed question of fact. Clemons alleges that as a result of the defendants' actions, he has been subjected to "public scorn and ridicule, and has suffered in his reputation," and the defendants have offered no evidence to rebut this allegation. In addition, there was extensive media coverage of the PSC investigation, Chief Hansen's threatened resignation, and related police matters, including Clemons' discharge in connection with the investigation of the police department. The press reported, for example, that Clemons' discharge was the "beginning of a shake-up within the department to improve discipline and morale"; that Chief Hansen said in connection with Clemons' discharge that, "Those personnel known to have a bad attitude and who are continually causing a disturbance will be disciplined or terminated"; and that a police department spokesman said that Clemons had been an agitator and a troublemaker. Finally, the record is uncertain as to who was in attendance at the Board of Commissioners meeting(s) at which Chief Hansen's grievances against Clemons were discussed. These considerations preclude a holding on summary judgment that Clemons was not publicly stigmatized.[8]

Concluding our discussion of whether Clemons was entitled to a due process hearing in connection with his discharge, we note finally that Chief Hansen notified Police Officers Standards and Training Council of Clemons' discharge, and that POST subsequently revoked Clemons' certification, rendering him ineligible to be a policeman in Georgia. The foreclosure of the discharged employee's freedom to take advantage of other employment opportunities is an alternative circumstance giving rise to liberty interests, independent of public stigmatization. *Board of Regents v.*

---

**8.** On the record before us, we do not deem it appropriate to attempt to analyze each separate charge against Clemons so as to determine whether it was both potentially stigmatizing and publicly disclosed. Without intimating prematurely how fine a match between potentially stigmatizing charges and publicly disclosed charges Clemons must establish in order to be entitled to a jury verdict, we do note that Clemons' presentation at trial will need to be more refined in this respect in order for him to be entitled to a jury verdict than it has been to this point.

Roth, supra, 408 U.S. at 573–4, 92 S.Ct. at 2707 (dictum); *Dennis v. S. & S. Rural Consolidated High School Dist.*, 577 F.2d 338, 343 (5th Cir. 1978). Absent a demonstration that Clemons' decertification by POST was not such a foreclosure, the defendants would not be entitled to summary judgment even if their contention that Clemons was not publicly stigmatized were well founded. This point is addressed neither in the defendants' brief[9] nor in the opinion of the district court.[10] On this record, Clemons' decertification by POST is an alternative reason for our rejection of the district court's holding that the circumstances of Clemons' dismissal implicated no fourteenth amendment interest.[11]

B.

The district court held that even if Clemons was entitled to a hearing on the charges against him, his appearance before the Board of Commissioners satisfied due process. On appeal, Clemons asserts an array of procedural deficiencies in his appearance before the Board, urging, among other things, that he was given no prehearing notice sufficient to enable him to understand or rebut the charges against him; that the evidence presented to the Board consisted almost entirely of unsubstantiated hearsay; that his personnel file, which Chief Hansen relied on in presenting the case against him, contained damaging items of which he had no prior notice; that Hansen, in violation of the Board's procedural rule, submitted to the Board after the hearing additional damaging materials, to which Clemons had no opportunity to respond; that he was not permitted to present witnesses in his behalf; that the hearing was an unstructured free-for-all; that at least one Commissioner improperly placed on Clemons the burden to prove his innocence of the charges; and that the Commissioners generally regarded the hearing as a mere courtesy, and were predisposed to uphold Chief Hansen rather than to review impartially the charges against Clemons.

■ We need not address the bulk of Clemons' allegations to reach the conclusion that the district court erred by holding that the record demonstrated no factual dispute whether Clemons was afforded an adequate hearing. Due process required, *at least*, that Clemons be advised of the charges against him in sufficient detail fairly to enable him to show any error that might exist, and that he be heard by an impartial tribunal. *See, e.g., Stewart v. Bailey*, 556 F.2d 281, 285 (5th Cir. 1977); *Ferguson v. Thomas*, 430 F.2d 852, 856 (5th Cir. 1970). The record manifests a genuine factual issue as to both of these requirements.

As to the notice requirement, the defendants maintain that Clemons appeared twice before the Board of Commissioners, and that at his second appearance, he had a full and fair opportunity to answer the charges that had been presented during his first appearance. However, the record readily permits the inference that Clemons made but one appearance before the Board. See p. 2656, *supra*. In that event, Clemons' sole notice of the charges was the vague and conclusory termination letter Chief Hansen handed him on March 27. That letter did not provide due notice of the charges Clemons claims were made against him in his appearance before the Board.

As to the requirement of a hearing by an impartial tribunal, several of the Commis-

---

9. The defendants offer the bare conclusion that "This case is clearly not the 'different case' alluded to in *Roth*," but they offer no support for their position.

10. The district court's opinion makes no allusion to the possible implication of a liberty interest by the dismissal of a public employee in circumstances which foreclose future employment opportunities. The court's sole reference to Hansen's communication to POST was in the context of the necessity of public disclosure of stigmatizing charges.

11. We have indicated that if Clemons prevails on his due process claim, he will be entitled to a hearing to clear his name, but not to reinstatement or back pay. See note 7, *supra*. Without prejudging the matter, we note that if Clemons prevails on the foreclosure-of-employment-opportunities aspect of his due process claim, he *may* be entitled to appropriate relief in addition to the hearing he seeks; for example, the district court might appropriately order the defendants to notify POST that a hearing had been ordered and then to communicate to POST the results of the hearing.

sioners testified at their depositions that they regarded the hearing as a mere courtesy, that they regarded the real issue as whether to support Chief Hansen by sustaining his decision, and that they did not regard it as their role to determine the truth of the allegations against Clemons.[12] Again, for purposes of summary judgment, the record permits the inference that the Board of Commissioners did not constitute an impartial tribunal to review the charges against Clemons.[13] For these reasons, the district court's holding that there was no fact issue as to the procedural adequacy of Clemons' appearance before the Board of Commissioners cannot stand.

### IV.

We REVERSE the judgment of the district court and REMAND for further proceedings not inconsistent with this opinion.

**12.** Commissioner Gambrell testified that in his view the matter should not have been brought before the Board at all, and that the appearance of a discharged employee before the Board is not a hearing or a trial, but a courtesy. He characterized the Board's decision as a vote "to go along with the Chief's decision to fire Mr. Clemons," and testified that he did not feel it necessary to look into the validity of the charges presented.

Commissioner Brunson clearly saw the issue as whether to support the Chief:

> Q: Do you remember a vote on the Clemons termination?
> A: I can remember us taking a vote as to whether or not we were going to uphold the Chief or not, and we voted to uphold the Chief.
> Q: In your recollection, is that how the question was put, whether or not to uphold the Chief?
> A: Well, the whole point, that was the whole point of the hearing was whether or not we were going to support the Chief,
> . . .

Commissioner Barrett stated that the hearing was a courtesy, "not a court case, it was just a matter of allowing to be heard." He also characterized the Board's decision as "sustaining the action of the Chief," and commented that, although he thought the matter had not been brought out at the Clemons hearing, "the Chief had expressed his feeling that . . . he needed to be sustained if he was expected to run the department."

Commissioner Underwood repeatedly referred to the decision "to sustain the Chief."

He testified, though, that he did not regard the issue as one of supporting the Chief or not supporting the Chief, but that some of the Commissioners did take that view.

Commissioner Prince acknowledged that he stated in the meeting of the Board of Commissioners that having appointed Hansen Chief, the Board should support his decisions. He also acknowledged that his desire to support the Chief played a role in his decision.

**13.** We must observe that one of several vexing matters for the district court as this case proceeds, see notes 4 and 8, *supra*, will be to identify the point at which Clemons became entitled to a hearing. Since he concedes that he had no property interest in his position, Clemons was not entitled to any hearing until he was either publicly stigmatized or foreclosed from future employment opportunities in connection with his discharge. It is altogether possible that Clemons was not entitled to the hearing the Board of Commissioners granted him, and that only upon the public disclosure of accusations made at the hearing did he become entitled to a hearing *to clear his name*. See note 7, *supra*. Thus, the Commissioners who viewed Clemons' appearance as a mere courtesy may have been correct. We have decided only that the record does not foreclose the view that Clemons was at some point entitled to notice and a hearing and that the Commissioners assembled to hear Clemons' appeal from his termination *may* not have constituted an impartial tribunal.