**COMMODITY FUTURES TRADING COMMISSION, Plaintiff,**

v.

**MASS MEDIA MARKETING, INC. a Florida corporation; Commodity Referral Service, Inc., a/k/a Commodities Referral Service, Inc., a Florida Corporation and Rolando Nanasca, individually and as an officer and director of Mass Media Marketing, Inc. and Commodity Referrals Service, Inc.**

No. 97–1492–CIV–GRAHAM.

United States District Court,
S.D. Florida,
Miami Division.

March 20, 2001.

---

**1324**

Lawrence H. Norton, Daniel R. Salsburg, Jodi Siff, Commodity Futures Trading Commission, Office of General Counsel, Washington, DC, for plaintiff.

Robert Lawrence Bonner, Lorelei Jane Van Wey, Lawrence Brett Lambert, Homer Bonner & Delgado, Miami, FL, for defendants.

## ORDER

GRAHAM, District Judge.

THIS CAUSE came before the Court upon Defendants' Motion for Judgment on the Pleadings, or in the Alternative, Motion for Summary Judgment [D.E.100] and Plaintiffs' Motion for Partial Summary Judgment [D.E.101].

### I. STATEMENT OF FACTS

The following facts are undisputed. Mass Media Marketing, Inc. ("Mass Media") and Commodity Referral Service, Inc. ("CRS") (collectively "Defendants") are Florida advertising, marketing, video production and syndication companies whose marketing services range from advertising Ginsu knives and exercise equipment to promoting culinary schools and private universities. Rolando Nanasca ("Nanasca") is the President of both companies.

In 1995, Defendants added commodity futures to their marketing curriculum. Commodity futures involve the purchase of an option to buy or sell a particular commodity, such as unleaded gasoline, at a predetermined price on or before a given date. Defendants' marketing services entailed producing, directing and arranging for the broadcast of 60–second commercials and 30–minute long infomercials ("advertisements") touting the benefits of commodity futures investments. Each advertisement urged viewers, who had at least $5,000 to invest, to call a toll-free number featured in the advertisement to obtain information on how to profit from investments in commodity options. Once a viewer placed a call to the toll-free number, the answering service operator would ask what product or service the viewer was calling about. If the viewer was calling in reference to a commodities advertisement, the answering service operator would give the caller a short description of the product or service being offered and would try to obtain the callers name, address and telephone number in order to create a "lead."

Defendants marketed two forms of advertisements, sponsored and non-sponsored. Sponsored advertisements were advertisements that Defendants created and broadcasted on behalf of a commodity broker registered with the Commodity Futures Trading Commission ("CFTC"). A registered commodity broker, also known as an Introducing Broker, essentially operates as a brokerage firm that solicits potential investors to place orders on commodity options. An Introducing Broker would seek the marketing services of Defendants to produce an advertisement approved by the Introducing Broker and featuring the Introducing Broker's name. Defendants would agreed to sell a specified number of leads generated by the advertisement to the sponsoring Introducing Broker. Any excess leads would be sold to other Introducing Brokers whose names did not appear in the advertisement.

Non-sponsored ("blind") advertisements were not approved by an Introducing Broker and did not include the name of an Introducing Broker in the advertisement. The leads generated from blind advertisements were sold on a random basis to any interested Introducing Broker. The contents of blind advertisements were ultimately approved by Nanasca who is not registered as a commodity broker.

Sponsored and blind advertisements essentially claimed that existing supply and demand factors in the cash market for a particular product, such as unleaded gasoline or soy beans, make options on that product's futures contracts "predictable" and "logical" and an investor had a "legitimate chance of doubling, tripling, or even quadrupling" his money. One advertisement described the manner in which commodities trading function as follows:

> We're discussing some common-sense approaches for investing in the commodities futures market and how to know when to invest.

> One of the most direct approaches in determining your investment in commodities options is what is known as trends. If you analyze and act upon a sound trend, then the profits can be astounding.

> There are many reasons that trends develop in commodities, but one of the more common reasons are of the cyclical nature, commodities such as unleaded gasoline and heating oil, for example. There's a much larger demand for heating oil in the winter, for obvious reasons. And for unleaded gasoline, the demand increases in the summer when people drive the most. These are seasonal trends, where the movement in price becomes predictable.

(CFTC's Exhibit 10, at 19–20). The advertisements assured viewers that although investment in commodities "[is] not for everybody, and it does involve risk," (CFTC's Exhibit 12, at 22) such "risks are, in fact, predetermined" and "known." (CFTC's Exhibit 16, at 6, 14).

Nanasca wrote most of the scripts for the advertisements produced by Defendants or had otherwise the "final say-so on the scripts." (Nanasca 10–1–96 Dep. pp. 193–195). Nanasca never "really researched" the background of commodities trading or the "way that commodities markets actually work[sic]" prior to writing the scripts and airing the advertisements. (Nanasca 10–1–96 Dep. p. 194). Instead, Nanasca based the advertisements' contents primarily on radio advertisements which he thought "sounded exciting," though he never took any steps to verify the accuracy of such information. (Nanasca 10–1–96 Dep. pp. 193–194).

Defendants also engaged in a program called "evaluated plus leads" whereby Defendants telephoned individuals who once

responded to an advertisement. If the individual reestablished their interest, then Defendants sold that lead to any interested Introducing Broker. The marketing and advertising services provided by Defendants never required Defendants to enlist callers to become Introducing Brokers' customers or to collect any money from callers. Rather, any discussions with callers about commodity investments occurred once the Introducing Broker purchased the leads from Defendants and contacted the prospective customers.

The National Futures Association ("NFA") is the commodity futures and options industry's self-regulatory organization. (Discoll Declaration at 3). In the early 1990's, the NFA determined that some Introducing Brokers provided prospective investors with misleading information about the seasonality· trends of commodities when soliciting their orders. Most of these Introducing Brokers received severe monetary penalties or were otherwise subjected to disciplinary action. To remedy this situation, on May 16, 1996, the NFA issued a notice stating that seasonality claims were a violation of its rules. In early 1997, Nanasca discovered that the NFA "frowned upon" blind advertisements because "someone's got to be responsible for the contents of those advertisements." Consequently, Nanasca voluntarily ceased to broadcast blind advertisements.

## II. PROCEDURAL BACKGROUND

On May 8, 1997, the CFTC filed a three-count Complaint against Mass Media, CRS and Nanasca, in his individual capacity, for alleged violations of the Commodity Exchange Act, as amended (the "Act"), 7 U.S.C. §§ 6(c)(b), 6d, 6k (1994) and the rules and regulations the CFTC promulgated thereunder, 17 C.F.R. §§ 33.10, 3.3, and 33.8 (1996). Specifically, the CFTC alleged that: (1) Mass Media, CRS and Nanasca committed fraud in connection with commodity options transactions in vi-

olation of the CFTC's regulations (Count I); (2) Mass Media and CRS acted as Introducing Brokers and Nanasca as an associated person of an Introducing Broker, without first registering with the CFTC in violation of the Act (Count II); and (3) Mass Media, CRS and Nanasca violated the record-keeping requirements of the CFTC's regulations (Count III). The CFTC sought a preliminary injunction, which the Court entered after the parties stipulated to the terms. The injunction directs Defendants to refrain from broadcasting any advertisements unless they first receive a letter from the NFA not opposing their broadcast. Moreover, Defendants are enjoined from providing leads to any entity other than the sponsor of the particular advertisement from which the lead is derived.

Defendants moved for judgment on the pleadings, or in the alternative, for summary judgment seeking judgment on all counts of the Complaint. The CFTC cross-filed a motion seeking partial summary judgment on all counts. After due consideration of the parties' pleadings, exhibits, affidavits, and oral arguments, the Court holds that Defendants are entitled to summary judgment on all counts of the Complaint.

## III. STANDARD OF REVIEW

The purpose of summary judgment is to determine "whether there is a need for trial—whether in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact ..." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is not a procedural shortcut. Instead, it is "an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett,*

477 U.S. 317, 327, 106 S.Ct. 2548, 2550, 91 L.Ed.2d 265 (1986).

A court may grant summary judgment only if it appears through pleadings, depositions, admissions and affidavits that there is no "genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. at 2552; *Real Estate Financing v. Resolution Trust Corporation,* 950 F.2d 1540, 1543 (11th Cir.1992); *McGahee v. Northern Propane Gas Co.,* 858 F.2d 1487, 1493 (11th Cir.1988), *cert. denied,* 490 U.S. 1084, 109 S.Ct. 2110, 104 L.Ed.2d 670 (1989). "The party seeking summary judgment bears the exacting burden of demonstrating that there is no genuine dispute as to any material fact in the case." *Clemons v. Dougherty County, Ga.,* 684 F.2d 1365, 1368 (11th Cir.1982).

In order for the court to determine whether the movant has met this burden, the evidence and all factual inferences therefrom must be viewed in the light most favorable to the non-moving party. *Clemons,* 684 F.2d at 1368, *citing Adickes,* 398 U.S. at 157, 90 S.Ct. at 1608. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Further, a dispute over a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. If the evidence is merely colorable or not significantly probative, a court may grant summary judgment.

## IV. DISCUSSION

This case requires the Court to engage in two stages of analysis. Initially, the Court will determine whether the Act's Introducing Broker registration requirement is applicable to Defendants advertisers. Lastly, the Court will inquire whether the CFTC may validly enforce its antifraud regulations on Defendants. Both are purely legal issues of first impression that require the Court to employ canons of statutory interpretation and construction. *See Chevron U.S.A. Inc. v. NRDC,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

### A. Introducing Broker Registration Requirement

■ Introducing Brokers form a category of commodity futures market participants created by Congress in 1982. *See* 7 U.S.C. § 1. Prior to 1982, Introducing Brokers acted as independently affiliated "agents" of Futures Commission Merchants ("FCM").[1] S.Rep. No. 97–384, at 40 (1982). The main function of such agents was to procure business for FCMs. *See id.* at 111. These unregistered agents operated free from regulation due to a gap in the Act's registration requirement which precluded jurisdiction by the CFTC over such agents. *See id.* at 40. In 1982, the CFTC advised Congress that the number of agents had increased significantly, and that FCMs who used their services "have often disavowed any responsibility for violations of the Act by these 'agents.'" *Id.* To remedy the ambiguity and the resulting uncertainties of the agents' regulatory status, the CFTC proposed that "each 'agent' of a futures commission merchant be re-

---

**1.** FCMs function as the commodity market's equivalent of a securities brokerage house, soliciting and accepting orders and funds for futures contracts and extending credit in con- nection therewith. *See First American Discount Corp. v. Commodity Futures Trading Commission,* 222 F.3d 1008 (C.A.D.C.2000).

quired to register as an associated person of that futures commission merchant." *Id.*

Congress, however, opted to resolve the problem by amending the Act to require all persons who solicit or accept customer orders for FCMs to register either as "associated persons" of the FCMs, or as part of a new class of registrants called Introducing Brokers.[2] *Id.* at 112. Unlike associated persons of a FCM, Congress viewed Introducing Brokers as independent entities that solicited and accepted customer orders, but used the services of FCMs for clearing, record keeping and retaining customer funds. *See id.* at 41.

Congress refused to require agents who were independent business entities to become branch offices of the FCMs who clear their trades or to impose vicarious liability on FCMs for the actions of an independent entity. *Id.* at 41. At the same time, however, Congress acknowledged the need to "guarantee accountability and responsible conduct of such persons," who "deal with commodity customers" and, thus have the opportunity to engage in abusive sales practices." *Id.* at 41 and 111. Hence, the Act defines an Introducing Broker as:

> any person (except an individual who elects to be and is registered as an associated person of a futures commission merchant) engaged in soliciting or in accepting orders for the purchase or sale of any commodity for future delivery on or subject to the rules of any contact market who does not accept any money, securities or property (or extend credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom.

7 U.S.C. § 1a(4).

In the instant case, the CFTC claims that by soliciting and referring prospective investors to Introducing Brokers, Defendants have themselves acted as unregistered Introducing Brokers in violation of the Act. The CFTC interprets the phrase "soliciting or in accepting orders" contained in the definition of an Introducing Broker as covering a whole range of conduct, including Defendants' solicitation to the public through television advertisements. In contrast, Defendants assert that the plain language of the Introducing Broker registration requirement excludes them from registration because they are advertising production companies that neither solicit orders, nor accept orders from customers. Defendants posit that the phrase "soliciting or in accepting orders" cannot conceivably cover general solicitation to the public through television advertisements, which neither invite nor accept the placement of an order.

The Court's analysis of an agency's interpretation of a statute follows the two-step framework of *Chevron Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). First, the Court must inquire "whether Congress has directly spoken to the precise question at issue," in which case the Court "must give effect to [the] unambiguously expressed intent of Congress." *Id.* However, if the "statute is silent or ambiguous with respect to the specific issue," the Court must employ the second step and defer to the agency's interpretation, but only if such an interpretation is "based on a permissible construction of the statute." *Id.* at 843, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694.

### 1. *Chevron Framework*

The first step of *Chevron* requires the Court to focus on the plain language of the

---

**2.** Like Introducing Brokers, Associated Persons of an FCM solicit futures orders and deal directly with the public, but do so under the supervision and control of the FCM that clear their orders.

statute to ascertain whether Congress' intent is clear and unambiguous. *Id.* "In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 1818, 100 L.Ed.2d 313 (1988). The Court shall assume that in drafting legislation, Congress said what it meant. *United States v. La-Bonte*, 520 U.S. 751, 117 S.Ct. 1673, 137 L.Ed.2d 1001 (1997).

Giving the words used in the Act their ordinary meaning, the Court finds that the phrase "engaged in soliciting or in accepting orders" contained within the definition of an Introducing Broker is subject to several interpretations. The Court cannot naturally discern whether Congress intended the term "soliciting" to modify the term "order" or if Congress intended the term "soliciting" to remain open-ended. The Act does not define the term "soliciting" nor does it explain its application. Even assuming the Court were to accept either party's interpretation of the phrase, the Court is still unable to determine whether the definition applies to advertisers. Accordingly, the Court finds the phrase to be ambiguous and will proceed to the second step of the *Chevron* analysis to determine whether the CFTC's interpretation of the phrase "engaged in soliciting or in accepting orders" is a permissible interpretation of the Act.

The CFTC interprets the phrase "engaged in soliciting or accepting orders" as covering customer "solicitation[ ] for compensated referral to other registrants so that a trading relationship can be initiated and the customer's orders executed." (Driscoll Declaration at 19). Based on this interpretation, the CFTC concludes that Defendants' activities fall within the Act because:

> Mass Media produces and arranges for the broadcast of its advertisements and infomercials for the sole purpose of obtaining the names, phone numbers and addresses of individuals who may be interested in purchasing options. Mass Media's entire activities are tied to the number of leads that they generate. It is compensated on a per-lead basis by the IBs to which the leads are sold and it pays, in some cases, for television air time on a per-lead basis as well. It also licenses these leads to IBs and attempts to relicense these leads to other IBs after a period of time.

(Driscoll Declaration at 21–22).

To support its interpretation of the phrase "soliciting or accepting orders," the CFTC relies substantially on the United States Supreme Court's characterization of the phrase "solicitation of orders" in *Wisconsin Dept. of Revenue v. William Wrigley, Jr., Co.*, 505 U.S. 214, 112 S.Ct. 2447, 120 L.Ed.2d 174 (1992). In *Wrigley*, the Supreme Court construed a provision of the Interstate Commerce Tax, 15 U.S.C. § 381(a)(1), that confers immunity from state income taxes on any company whose business activities in that state consist only of "solicitation of orders" for interstate sales. The issue before the *Wrigley* Court was whether and to what extent, a gum manufacturer's representative's activities constituted "solicitation of orders" where the activities neither explicitly nor implicitly proposed a sale. *Id.* at 223, 112 S.Ct. 2447. The Court concluded that the phrase "solicitation or orders" in the Interstate Commerce Tax Act cannot be interpreted narrowly to cover only actual request for purchases but included the entire process associated with inviting an order. *Id.* On the other hand, the Court held that the phrase should not be interpreted so broadly to include all activities that are routinely, or even closely associated with solicitation or are customarily performed by salesmen. *Id.*

The facts of *Wrigley* are inapposite to the facts in this case because the Court is determining a business' tax immunity pursuant to an immunity provision contained in the Interstate Commerce Tax Act. However, the Supreme Court's discussion of the activities that would constitute "solicitation of orders" is nonetheless helpful to this analysis. Pursuant to *Wrigley*, a key question in determining whether an activity constitutes "solicitation of orders" is whether the only objective for conducting the activity is to facilitate requests for purchases. If so, the activity is the solicitation of an order. *Id.* at 227, 112 S.Ct. 2447. On the other hand, if "there is a good reason" to conduct the activity that is not entirely ancillary to requesting purchases, activity that the company would have reason to engage in anyway, then it is probably not the solicitation of an order. *Id.* To elucidate this point the *Wrigley* Court gave two examples:

> [p]roviding a car and a stock of free samples to salesmen is part of 'solicitation of orders,' because the only reason to do it is to facilitate requests for purchases ... [however] employing salesmen to repair or service the company's products is not part of the 'solicitation of orders,' since there is good reason to get that done whether or not the company has a sales force.

*Id.* at 227, 112 S.Ct. 2447. After applying this reasoning and considering other relevant factors, the Court cannot conclude that the CFTC's interpretation of the phrase "engaged in soliciting or in accepting orders" is a permissible interpretation of the Act.

First, Defendant advertisers' primary goal is to obtain leads, not orders for commodity futures. The CFTC's expert opines that Defendants' "entire activities are tied to the number of leads that they generate" and Defendants conduct their advertisements "for the sole purpose of obtaining the names, phone numbers and addresses of individuals who may be interested in purchasing options." (Driscoll Declaration at 20). Defendants never collected any money from viewers of the advertisements and never received compensation for the number of callers who subsequently opened accounts through an Introducing Broker. Accordingly, the Court finds that Defendants' main objective in broadcasting the advertisements was to facilitate the collection of leads, not to facilitate the purchases of orders for futures contracts.

Second, Defendants have a "good reason" to conduct their advertising activities that is not entirely ancillary to requesting purchases. Through their advertisements, Defendants find individuals who may become prospective commodity customers. As such, Defendants' activities are better characterized as those of a customer finder rather than an Introducing Broker. The Act, however, does not require a person who acts as a customer finder to register as an Introducing Broker. *See Carr v. Phoenix Futures, Inc.*, 1991 WL 121184, *2 (E.D.N.Y. June 24, 1991) (holding that a customer finder is not required to register under the Act).[3] Moreover, unlike Introducing Brokers, whose compensation is commensurate with the orders obtained, Defendants receive compensation for the leads regardless of the Introducing Broker's success in soliciting, accepting or introducing an order to an FCM. Hence, Defendants have a "good reason" for conducting their solicitation activities that is not ancillary to requesting purchases. Accordingly, the Court finds that Defendants'

---

**3.** The Court does not rely on this opinion from the Eastern District of New York as binding precedent. *See Fox v. Acadia State* *Bank,* 937 F.2d 1566, 1570 (11th Cir.1991). Rather, the Court refers to the District Court opinion as persuasive authority.

activities fail to meet the *Wrigley*'s rationale and do not amount to "solicitation of orders"

Other factors similarly fail to support the CFTC's interpretation of the Introducing Broker registration requirement. First, the CFTC's prior understanding of the objective behind the 1982 Introducing Broker registration requirement cannot be reconciled with the CFTC's current interpretation. In its Rules and Regulations, passed shortly after the 1982 amendments, the CFTC expressed its understanding of Congress' intent "to require registration as Introducing Brokers those persons who were formerly agents of FCMs" or who "performed the types of activities traditionally engaged in by agents." *See* Introducing Brokers and Associated Persons of Introducing Brokers, Commodity Trading Advisors and Commodity Pool Operators; Registration and Other Regulatory Requirements, 48 Fed.Reg. 35248 (Aug. 3, 1983). The CFTC proceeded to describe those types of traditional activities: "[h]istorically, agents have carried all of their accounts on a fully-disclosed basis with an FCM which provided 'back office' services for those accounts... which had been introduced by the agent to the carrying FCM." 48 Fed.Reg. at 14935. The CFTC expressed no concern about advertisers or entities who simply generate and sell leads to Introducing Brokers. The Court finds this factor to be specifically relevant because based on the CFTC's prior interpretation of the Introducing Broker requirement, Defendants would not be required to register under the Act.

Second, the Act's legislative history, which delineates the underlying purpose of the Introducing Broker registration requirement, makes not a single reference to advertisers or an intent by Congress to regulate as Introducing Brokers entities who neither invite, nor accept the placement of an order. Instead, by enacting the Introducing Broker registration requirement Congress aimed to "resolve[ ] any uncertainty as to the status of agents of future commission merchants [FCM]," and to regulate individuals in their activities of soliciting orders for futures contracts. *See* H.R. REP. No. 97–565, at 49 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3898. Congress resolved to authorize the CFTC to regulate agents of FCMs who have the means and incentive to engage in abusive sales practices while soliciting possible investors to open trading accounts with a FCM. *See id.*

In contrast, in the instant case, Defendants never introduced an account to an FCM or any registered entity. Defendants' general solicitation through their advertisements never involved the making of an offer to enter into a commodity transaction or assisting customers in carrying out such transactions. Each advertisement produced by Defendants was assigned a toll-free number. Once a viewer placed a call to the toll-free number, the answering service operator would ask what product or service the viewer was calling about. If the viewer was calling in reference to a commodities advertisement, the answering service operator would give the caller a short description of the product or service being offered and then would try to obtain the callers name, address and telephone number in order to create a lead.[4]

---

4. Excerpt from Nanasca's deposition on October 1, 1996:

Q. Do they [answering service operators] give out any information when a caller calls in, or do they -

Nanasca. No. Their—their job is to capture information. That's it.

They'll ask if there's a—they'll say, what is this about?

And then there's one line sentences, complimentary information package about commodities, you know commodities broker, whatever the description is on that product. It could be shorts, or it could be exercise

After collecting all the leads from the answering service, Defendants sold the leads to Introducing Brokers. Any meaningful discussions with callers in regards to investing in or placing an order for commodities only occurred once an Introducing Broker purchased the leads from Defendants and contacted the prospective customers. Therefore, Defendants lack the means and incentive to create the scenario for potential misconduct during the solicitation process that triggered Congressional enactment of the Introducing Broker registration requirement in 1982.

Third, the CFTC has introduced no evidence to establish that Defendants' advertisements have caused commodity investors the type of harm Congress intended to prevent by enacting the Introducing Broker registration requirement. On the contrary, the record shows that the CFTC is effectively protecting the public by imposing strict solicitation guidelines on Introducing Brokers. The CFTC's expert confirms that the NFA has taken "several disciplinary actions against Members [Introducing Brokers] for the foregoing promotional practices." (Driscoll Declaration at 17). Moreover, Introducing Brokers are subject to serious monetary penalties, including customer restitution, if they fail to fully disclose to prospective investors the risks involved in commodity investments, especially when the investor's interest in commodities stems from television advertisements. *See Scheufler v. Stuart,* 1997 WL 599871 (C.F.T.C.) (Introducing Broker held liable for failure to fully disclose realistic profit and risk information to infomercial viewer). Hence, the evidence before the Court supports the view that the "simple act of referral does not directly jeopardize the interests of the investing public." *See Carr,* 1991 WL 121184, at *2. After examining these relevant factors, and mindful of the deference due the CFTC's interpretation of the Act, the Court finds no permissible basis that would justify the CFTC's expansive interpretation of the Act's Introducing Broker registration requirement.

Congress has ample authority to expand the Act's registration requirement to include advertisers, such as Defendants. Congress, however, has not done so. The phrase "soliciting or accepting orders" does not cover Defendants' activities. To adopt the CFTC's definition of an Introducing Broker and require Defendants to register as such would amount to impermissible law making and would constitute a deviation from clear Congressional intent to "eliminate the unregistered statutory category of agents of an FCM." H.R.REP. NO. 97–444, p. 47 (1983). For the foregoing reasons, the Court grants Defendants' Motion for Summary Judgment as to Counts II and III.[5]

## B. The CFTC's Anti-fraud Regulations

Having determined that the Act's registration requirement is inapplicable to Defendants as advertisers, the Court's next inquiry is whether the CFTC may still enforce its anti-fraud regulations against Defendants. The CFTC contends that it has the authority to impose anti-fraud regulations on Defendants, even if Defendants do not meet the Introducing Broker regis-

---

equipment. And they have a small explanation as to what, you know, product or service that is being offered. But that's it. That's all they have is one or two sentences, I think, where—for some reason twenty-four characters comes to mind is what you got to explain.
(Nanasca 10–1–96 Dep. pp. 111–112).

5. Because the Court has determined that neither Mass Media nor CRS is an Introducing Broker under the Act, Nanasca need not register as an Associated Person of an Introducing Broker pursuant to 7 U.S.C. § 6k(1). On the same basis, the Court finds that Defendants committed no violations of the Introducing Broker record keeping requirement.

tration requirement. Defendants contend that the CFTC's anti-fraud regulations, to the extent the CFTC seeks to enforce them against Defendants, are invalid because they enlarge the CFTC's jurisdiction beyond the authority granted to the CFTC by Congress. Therefore, Defendants make a substantive challenge to the CFTC's anti-fraud regulations, for which the Court must employ the two-step *Chevron* analysis as already set forth above.

As stated earlier, the first step in the *Chevron* framework requires the Court to ascertain whether Congress clearly expressed its intent in the Act's language. If the Court is able to ascertain Congress' unambiguously expressed intent from the plain language of the Act, that is the law and the inquiry ends. *Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778. The Act provides that:

> No person shall offer to enter into, enter into or confirm the execution of any transaction involving any commodity regulated under this chapter which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guarantee" or "decline guarantee" contrary to any rule, regulation, or order of the Commission prohibiting any such transaction or allowing any such transaction under such terms and conditions as the Commission shall prescribe.

7 U.S.C. § 6c(b) (1997).

This language is clear and unambiguous and neither party suggests otherwise. This provision prohibits persons who offer to enter into, enter into or confirm the execution of any transaction involving any commodity, to do so contrary to CFTC's rules and regulations. Accordingly, any rules or regulations promulgated by the CFTC, including the anti-fraud regulations at issue in this case, are applicable only to entities who engage in the activities listed in § 4c(b).

The CFTC, however, does not claim that Defendants engaged in any of these activities. The CFTC instead asserts that § 4c(b) of the Act empowers the CFTC to promulgate rules and regulations, and urges the Court to focus on the plain language of the CFTC's anti-fraud rules, which state:

> It shall be unlawful for any person directly or indirectly
>
> (a) to cheat or defraud or attempt to cheat or defraud any other person;
>
> (b) to make or cause to be made to any other person any false report or statement thereof or cause to be entered for any person any false record thereof;
>
> (c) To deceive or attempt to deceive any other person by any means whatsoever
>
> in or in connection with an offer to enter into, the entry into, the confirmation of the execution of, or the maintenance of, any commodity option transaction.

17 C.F.R. § 33.10 (1982). According to the CFTC, Defendants "fall squarely" within its anti-fraud regulations because through their advertisements they engaged in fraud, "directly or indirectly" "in connection with" commodity options "by any means whatsoever." Moreover, the CFTC contends that the "in connection with" language of its anti-fraud regulations is identical to language contained in the Securities Exchange Act.

■ A federal agency may possess broad powers to enact rules and regulations as it deems appropriate to effectuate legislative mandates. However, a federal agency may not make law or operate to create rules in disharmony with the congressional statute it administers. *Legal Envtl. Assistance Found. Inc. v. U.S. Envtl. Protection Agency*, 118 F.3d 1467, 1473 (11th Cir.1997). In this case, perceiv-

ing that the statutory language disfavors its position, the CFTC extracts its jurisdictional authority from its own rules and regulations. The CFTC has cited to no portion of the Act or the Act's legislative history that confers the CFTC with the authority to impose its anti-fraud rules and regulations on entities who do not participate in commodity trading transactions.

 The CFTC has likewise identified no legal authority which would support a federal agency's imposition of its rules and regulations on entities who neither are, nor should be governed by the statute. Instead, the cases cited by the CFTC involved entities who, although unregistered, had direct participation in the commodity market or were otherwise required to be registered with the CFTC, and all involved alleged violations of the Act's anti-fraud provision, not the CFTC's anti-fraud regulations.[6] The CFTC, however, does not contend that Defendants violated the Act's anti-fraud provision, which is narrower in jurisdictional scope than the CFTC's anti-fraud regulations. Finally, the fact that portions of the CFTC's anti-fraud regulations are similar to the anti-fraud provision of the Securities Exchange Act is irrelevant to the inquiry into the CFTC's jurisdiction in this case.

Given the straightforward statutory command, the Court ends its inquiry at the first step of *Chevron*. The Act clearly and unambiguously permits the CFTC to enforce its rules and regulations only on entities who "offer to enter into, enter into or confirm the execution of any transaction involving any commodity regulated by the Act." Hence, the Court finds that while the CFTC may liberally choose how to promulgate its rules, the CFTC cannot choose to impose them on entities who the Act clearly excludes. The CFTC's anti-fraud regulations are therefore inapplicable to Defendants and Summary Judgment in their favor as to Count I is appropriate.

## V. CONCLUSION

Based on the foregoing analysis, it is

ORDERED AND ADJUDGED that Defendants' Motion for Summary Judgment is hereby GRANTED. It is further

ORDERED AND ADJUDGED that Plaintiff's Motion for Partial Summary Judgment is hereby DENIED. It is further

ORDERED AND ADJUDGED that all pending motions are DENIED as moot. It is further

ORDERED AND ADJUDGED that the parties are hereby DIRECTED to file a proposed form of Final Judgment for entry herein within twenty days from the date of this Order. It is further

ORDERED AND ADJUDGED that this case is hereby CLOSED for administrative purposes.

---

**6.** *See Hirk v. Agri–Research Council, Inc.,* 561 F.2d 96 (7th Cir.1977) (registered FCM violated Act's anti-fraud provision); *CFTC v. Savage,* 611 F.2d 270 (9th Cir.1979) (unregistered trader, who should have registered as Commodity Trading Advisor, violated Act's anti-fraud provision); *CFTC v. Avco Fin. Corp.,* 28 F.Supp.2d 104 (S.D.N.Y.1998) (unregistered individuals providing personalized trading advice violated registration and anti-fraud provision of Act).