[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
On January 9, 1984, the plaintiff, Dr. Charles D. Gianetti, a plastic surgeon, filed a three count complaint against the named defendant, Norwalk Hospital. The first and second counts of the complaint assert a claim for breach of contract. The third count asserted a claim under the Connecticut Antitrust Act. The plaintiff's claims arise from the hospital's decision not to reappoint Dr. Gianetti to the hospital's medical staff after approximately seven years of service. The plaintiff claimed that the non-reappointment decision violated his contractual rights under the hospital's bylaws.
After cross-motions for summary judgment were denied, the matter was referred to Attorney Trial Referee John J. Cotter (ATR Cotter). By decision dated May 4, 1987 ATR Cotter found, inter alia, that in 1974 the plaintiff was appointed a provisional member of the hospital staff; that in 1976, the hospital granted the plaintiff full privileges as an assistant attending physician; and, that the plaintiff's full privileges as an attending physician were renewed annually until the hospital's decision not to reappoint the plaintiff for the year 1984. ATR Cotter further found that the hospital's bylaws constituted a contract between the hospital and the plaintiff; that the hospital violated the bylaws' reappointment procedures when it decided not to reappoint the plaintiff; and, that the failure to follow the reappointment procedures constituted a breach of contract. ATR Cotter concluded, "[w]hether Dr. Gianetti has suffered damages as a result of Norwalk Hospital's breach of contract will require further testimony in Court at a time set by the Court."
On May 18, 1987, the defendant objected to the acceptance of the ATR report. Before the objection was heard, on February 17, CT Page 12278 1988, the parties filed a joint motion for reservation of legal issues for advice of the Connecticut Supreme Court. The Supreme Court exercised its discretion to accept the reserved questions as reframed by the court. Gianetti v. Norwalk Hospital,211 Conn. 51, 56-57, 557 A.2d 1249 (1989). The reserved questions as reframed by the Supreme Court were: "(1) Do the bylaws of the Norwalk Hospital constitute an enforceable contract between that hospital and Dr. Gianetti as a member of its medical staff? . . . (2) Are administrative decisions by the Norwalk Hospital, as to the rights of Dr. Gianetti as a medical staff member under its bylaws, subject to judicial review?" Id., 57.
On April 25, 1989, the Supreme Court released its decision and concluded that the hospital's bylaws do not constitute a contract between Norwalk Hospital and Dr. Gianetti. Id., 57-61. Nonetheless, the court concluded that "there is a contractual relationship between Norwalk Hospital and Dr. Gianetti, of which the Norwalk Hospital's medical staff bylaws are an integral part. The rights and duties arising out of his contractual relationship, as in any contractual relationship are subject to judicial review." Id., 66-67, 61-67.
Thereafter, the matter was returned to the Superior Court. On June 23, 1989, the court, Spear, J., ordered a hearing on the objection to the ATR's report. By memorandum dated June 17, 1993, the court, Spear, J., accepted the ATR report and dismissed the objections thereto. The court entered an interlocutory judgment of liability based on the ATR report and referred the matter for a hearing in damages.
On August 28, 1996, the plaintiff filed an amended motion to adjudicate the third count and to add a fourth count alleging violation of the Connecticut Unfair Trade Practices Act (CUTPA). On October 4, 1996, the court, Rush, J., denied the motion to adjudicate the third count, finding, in essence, that the plaintiff abandoned his claim in the third count. The court further denied the motion to add a CUTPA claim to the action.
On February 2, 1984, the court, Gerety, J., heard the plaintiff's Motion for Temporary Injunction to restore Dr. Gianetti to Norwalk's staff until it eventually provided him a hearing. That motion was denied on December 10, 1986.
The case was heard by this court on July 26, 27 and 28, 1999, on both a claim for permanent injunctive relief to restore Dr. CT Page 12279 Gianetti to the Norwalk Hospital staff and the plaintiff's claim for money damages.
On July 28, 1999, the court denied all claims for permanent injunctive relief by an oral memorandum of opinion. The balance of this opinion will deal exclusively with the subject of damages and whether the plaintiff is entitled to any damages based on the facts of this case.
Before dealing with the question of loss of income, the court will briefly discuss other damage claims to which references have been made at one time or another in this case. Dr. Gianetti, in his testimony, claimed that as a result of his non-reappointment he had problems with his malpractice insurance, it affected his ability to take medical board exams, had difficulty in getting staff privileges at other hospitals as well as H.M.O.'s and related providers. Unfortunately, he offered no evidence to support any particular claim.
No evidence was offered concerning malpractice insurance at all, including its non-availability or any increased cost or lower coverage. As far as medical specialty boards, he was not board certified in 1983, is not now and has never applied for any board. As far as applying for additional medical staff affiliations, he said he considered Griffin Hospital in Derby but decided against it and felt that all other hospitals were too far away. He has made no application to any new hospital since 1983, and in fact dropped his affiliation with Milford Hospital in 1993 because it was not cost effective. As far as H.M.O.'s or related providers, he has offered no evidence that he either lost any affiliations he had in 1983 as a result of Norwalk Hospital's action or that any subsequent applications were denied.
The only testimony offered during the trial was in support of his claim that his financial loss is or should be measured by the additional income he would have earned during not only the past fifteen years but for the next ten years at Norwalk Hospital. The ten year prospective period is based on the plaintiff's testimony that he intends to work for another ten years.
This file is replete with memorandums, new and old, on the subject of compensatory damages. The plaintiff first briefed the subject on June 21, 1995. Since then, the plaintiff has filed two supplemental memorandums regarding damages, not including his final brief. The defendant also briefed the issue on June 21, CT Page 12280 1995, again on July 26, 1997 and finally in its brief of August 31, 1999. The court has reviewed all the memorandums and the cases cited therein. The greatest problem is that most of the cases do not involve persons such as the plaintiff who is providing personal services to the general public and obviously his capacity to do that is limited by the hours of the day.
It would be of little service to anyone to merely repeat here the general measure and method of calculating damages under Connecticut law in breach of contract cases because most of those cases would be inapplicable here. This is not a "lost volume seller" theory of damage case where the claimant had enough capacity to have fully performed the contract as well as his or its other business. See McMahon v. Bryant Electric,121 Conn. 397, 407 (1936). That case, which adopted the lost volume theory, specifically stated it would not apply to contracts for personal services. The logic of this distinction is obvious. If a contract employee is terminated in breach of his contract with his employer and remains unemployed at no fault of his for the term of his contract, the measure of damages is clear and simple. He would be entitled to the benefit of his bargain and be placed in the same position he would have been in if the contract had been performed. On the other hand, if the terminated employee immediately finds a suitable position at the same or higher compensation, the result would be different.
It has been the plaintiff's position, at least in his earlier memorandums, that he not only has no duty to mitigate damages, but even if he does, that fact should not in any way be considered in determining his damages. He claims his damages are fixed regardless of whether he was able to move his Norwalk practice to other hospitals where he remained on staff or whether he worked to his full capacity in subsequent years. This court does not agree.
The court does specifically find that there was an obligation to mitigate damages in this case and that, therefore, the status of the plaintiff's practice after 1983 is relevant on the issue of damages. Willametz v. Goldfeld, 171 Conn. 622 (1976);Newington v. General Sanitation Serv. Co., 196 Conn. 81, 85
(1985); Gargano v. Heyman, 203 Conn. 616, 620-21 (1987).
In the case of Davis v. West Community Hospital, 735 F.2d 455 (1985), a physician in somewhat similar circumstances to the plaintiff herein sought injunctive relief and damages for, among CT Page 12281 other things, tortuous interference with business relationships arising from his permanent suspension. The court awarded him $170,000 in compensatory damages and $60,000 in punitive damages. Those awards of damages were rejected on appeal on the basis that the doctor sustained no actual damages because he was on the staff of two other local hospitals and his income increased in the year of his suspension. Similarly, in Fletcher v. Eagle RiverMemorial Hospital, Inc., 401 N.W.2d 297, 302 (1989), the court concluded the plaintiff suffered no economic loss. In the case ofMcMillan v. Anchorage Community Hospital, 646 P.2d 859, 867 (1982), involving the summary suspension of a physician, the court established the measure of damages as the plaintiff's loss of income minus any mitigation of damages from the date of the summary suspension to the subsequent proper suspension.
The plaintiff in his brief relies on the case of Rice v.Community Health Assoc., 40 F. Sup.2d 788 (S.D. W. Va. 1999) in support of his position. That case is inapplicable to the facts in this case. In Rice the plaintiff was an employee of the hospital under an employment contract for five years as an emergency room physician. Here there was no contract of employment between the parties. Additionally, in Rice the plaintiff claimed malice in that there was no reason or a false reason for having summarily terminated him. In this case at the plaintiff's request this court sustained all of plaintiff's objections to defense counsel's questions regarding cause for the non-reappointment so this court could draw no conclusions concerning malice or the lack thereof. And, lastly, any discussions in Rice and the specific charge the court gave the jury on the issue of mitigation of damages assumed the existence of proven malice which was not alleged or proven in this case.
With those precedents in mind, the court will now examine the plaintiff's situation, both before and after he was not reappointed to the staff at Norwalk Hospital in contravention of the hospital's bylaws.
The plaintiff had been on the staff at Norwalk Hospital since 1974. From 1976 until 1982, he was one of three plastic surgeons on staff who shared the "on rotation" or "on-call duty" in the emergency room. In 1982, a fourth doctor was added to that rotation. Dr. Gianetti's Norwalk income, which will be discussed shortly, was mainly derived from emergency room referrals. During 1983, the plaintiff was also on the medical staffs at Bridgeport Hospital, St. Vincent's Hospital and Park City Hospital, all in CT Page 12282 Bridgeport, as well as the Milford Hospital. At that time, his primary office and practice was in Bridgeport, but he maintained satellite offices in Milford and Westport, which were required by the bylaws of Milford and Norwalk Hospitals.
In support of his damage claim, the plaintiff offered the testimony of Professor Kurt Schlichting of Fairfield University, a statistician, as well as the testimony of Mr. Gallo, a certified public accountant, who offered testimony as to the expenses attributable to the Norwalk office that were used by Professor Schlichting in preparing his models. In evaluating those models with a mind to using them to determine damages, those claimed damages are recoverable only to the extent that the evidence affords a sufficient basis for estimating their amount with reasonable certainty. Beverly Hills Concepts, Inc. v. Schatz,Schatz, Ribicoff Kotkin, 247 Conn. 48 (1998). Put another way, in order to recover for lost profits or lost income, the plaintiff must present sufficiently accurate and complete evidence for the trier to estimate the loss with reasonable certainty. See Gargano v. Heyman, supra. Therefore, the assumptions that underly the models used must accord with reality and reasonableness. The defense presented the testimony of Allen Kosowski, also a certified public accountant, who prepared several exhibits based on the plaintiff's figures and his expert's models to cast doubt on their viability and reasonableness.
In his post hearing memorandum the plaintiff attaches as exhibits A and B two new variations of trial exhibits 3 and 4, the exhibits that demonstrated respectively his claim for damages under Model I and II. Those new variations, one dated August 11 and August 12, 1999, were presented some two weeks after the trial ended. The numbers contained therein were not presented in evidence at the trial, and this court must and does ignore them on the subject of damages. The court's analysis must be restricted to plaintiff's exhibits 3 and 4 and any other related exhibit offered during the trial.
As far as Model I is concerned, its essence is set forth in plaintiff's exhibit 3. It begins by detailing the gross income of the plaintiff taken from his tax returns for the years 1978 through 1983, his gross expenses taken from his Schedule C's to arrive at his net income and then a breakdown showing his Norwalk gross for those same years which is set forth in column "C" and then the percentage that the Norwalk income compares to his CT Page 12283 gross. As an example, the plaintiff's gross income in 1978 was $198,673 and of that $69,635 was Norwalk income or 35.1% of his gross. The balance of the years through his last year of practice at Norwalk Hospital is set forth below and is derived from plaintiff's exhibit 3.
YEAR GROSS INC. NET INC. NORWALK INC. % OF INCREASE
1979 $207,291 $144,333 $ 74,669 36% 1980 211,671 147,826 55,666 26.3% 1981 208,219 126,318 68,215 32.8% 1982 212,053 137,967 70,015 33% 1983 216,577 112,375 43,687 20.2%
TOTAL $1,254,484 $825,112 $381,887
Reference is made to the first full paragraph on page two of the plaintiff's post hearing memorandum where the plaintiff claims "it is undisputed . . . that his gross income from his Norwalk practice from 1978 through 1983 was $1,254,484 and his net income was $825,112 . . ." when in fact for that period his gross income from Norwalk only amounted to $381,887, pursuant to his own exhibit.
The balance of the exhibit then takes his gross gross income for the years 1984 through 1999, all of it obviously, non Norwalk income, and then applies a percentage to his gross income to project the anticipated Norwalk income he claims he would have generated based on the various percentages set forth in Models Ia, Ib, Ic and Id. Model I is broken down into four sub-groups entitled Model Ia, Ib, Ic, and Id based on the percentage used as follows: Model Ia, 30.6%, the average percentage that his Norwalk income compared to his gross income for the years 1978-1983; Model Ib, 36%, the year 1979 in which his Norwalk income was the highest compared to his gross income; Model Ic, 32.6%, the average for the years 1978-1982 that his Norwalk income compared to his gross income over that period; and Model Id, 33%, being the percentage of his Norwalk income as compared to his gross income for the year 1982 only. Based on which sub-model you utilize, the plaintiff claims his net lost income from Norwalk from 1984 through 1999 to be a low of $1,706,373 under Model Ia and a high of $2,171,745 under Model Ib.
To further illustrate the plaintiff's methodology, this court will consider the CT Page 12284 plaintiff's gross income for 1984 of $225,815 from plaintiff's exhibit 3, made up of all non Norwalk income, and then applying the percentages set forth above for his various sub-models, he projects his Norwalk income for 1984 to be 99,359 under Model Ia, $126,456 under Model Ib, $109,294 under Model Ic and 100,027 under Model Id, all much higher figures than he ever previously made in Norwalk. From each of these numbers he subtracts 11.41% representing his accountant's calculation of Norwalk expenses. That percentage was arrived at by the accountant by taking his gross expenses for the years prior to 1984 and removing only those items of expense that were exclusively related to Norwalk. Thus, there was no consideration given to such an item as malpractice insurance in determining Norwalk expenses. In plaintiff's exhibit 3, that same percentage of 11.41 was used as a constant factor from 1984 to 1999.
The court has serious reservations about the validity of the basic assumptions used in all of the variations of Model I. To understand this reservation, we should begin with an analysis of pre 1984 income. The plaintiff's gross income in 1978 was $198,673 and his gross income in 1983 was $216,577, an increase on average of under two per cent per year. What is of particular interest is that despite a relatively constant gross income, his Norwalk income has varied markedly over that same period. Looking at 1980, while his gross income increased to $211,671, his Norwalk income decreases from the previous year by $19,002. His gross income increased because he was able to increase his non Norwalk income for that same year by $23,383. Bear in mind that his non Norwalk income was being generated from his main office in Bridgeport where he remained on the staffs of three hospitals.
To illustrate this point further, the court will analyze his income for 1983 and 1984. In 1983, his gross income was $216,577, an increase from the previous year of $4,524, despite the fact that his Norwalk income dropped to $43,687, a decrease of $26,328 from the previous year. The plaintiff was obviously able to overcome the loss of the Norwalk income by increasing his non Norwalk income by $30,852 for that year.
Of most significance is what actually happened in 1984, the first year that he had no Norwalk related income. Instead of a decrease in his gross income, the plaintiff's gross actually increased to $225,815, an increase of $9,238 over 1983. This was all raised from non Norwalk sources. What this leads the court to conclude is that whenever the plaintiff's Norwalk income CT Page 12285 decreased and after it was reduced to zero in 1984, he could increase his commitment to his main practice in Bridgeport and not only make up the difference but increase his gross.
This conclusion is further supported by what took place in subsequent years. From 1984 to 1990, the plaintiff's gross income rose steadily each year except 1987 from $225,815 in 1984 to $484,981 in 1990, an increase of $259,166. Thereafter, his income began to recede but it would be impossible to connect that circumstance to any fallout from the conduct of the defendant in this case. General market conditions, the advent of H.M.O.'s and the reimbursement for elective plastic surgery procedures all may have played a role.
With that as a benchmark, the court must now test the reasonableness of the conclusions raised in any of the Model I configurations. As has been previously stated, those sub-models merely took a particular percentage based on past history of Norwalk income as it compared to gross income and came up with the projected figure for "lost" Norwalk income. It did not factor in in any way the plaintiff's ability or capacity to follow cases in Norwalk or whether the level of income projected for future Norwalk income was even available. It simply said that despite how high the non Norwalk income increased in the future, it would apply a certain past percentage to determine future Norwalk income. This approach the court finds to be unreasonable, lacking in certainty and based on the assumption that no matter how busy the plaintiff became in his non Norwalk practice he could be available for an increase in the Norwalk practice. Although the plaintiff claimed he could have handled all the additional work (if in fact it was available), the court does not find that credible or reasonable.
If we take 1990, when his gross income from his non Norwalk practice increased to $484,981, the various sub-models under Model I project the plaintiff's gross Norwalk income for that year to be from a low of $213,392 to $271,589, almost three times higher than his best Norwalk income prior to 1984 and again all of this with no assurance that any doctor and in particular this plaintiff could provide these professional services or whether that level of shared cases and resulting income were even available at Norwalk. There was simply no evidence presented to establish what fees were paid at Norwalk Hospital in 1990 for emergency room referrals to plastic surgeons. CT Page 12286
The court finds Model I to be fatally flawed, based on assumptions that cannot be supported, and it furnishes this court with no reasonable yardstick to assess damages. That is further supported by the obvious fact that the plaintiff's gross income for each of the years 1984 through 1994 exceeded his gross earnings for 1983.
The court will now review the alternative theory for damages based on Model II as set forth in plaintiff's exhibit 4. The factual predicate for this model is completely different than for Model I. For this model, Professor Schlichting analyzed data from the Norwalk Hospital emergency room for the period June 1, 1996 through February 20, 1998, as it related to plastic surgeons. Why a period so far away from 1984 was used was not explained but by its very nature it puts at risk any of the conclusions that it reaches. Also, at that time there were eleven plastic surgeons on staff at Norwalk Hospital of which eight actually shared in emergency room referrals, not the three or four when the plaintiff was there. He then reviewed both the "on call" schedule for the emergency room and the number of cases handled by each doctor. He found large variations in the figures. Some doctors obviously got other doctors to take their schedules and therefore some doctors had fewer cases and others had many cases.
The professor then took the three doctors for that period who had the most cases, averaged their case loads and determined that on average for 1997 they handled 69 cases each. Professor Schlicting then assumed, despite the passage of time and the fact that the plaintiff's practice had grown substantially in Bridgeport over the years, that had the plaintiff stayed on the staff at Norwalk, he would be among the top three suppliers of emergency room services at Norwalk for all the years from 1984 to 1999 and assigned him 69 cases per year.
In order to arrive at a dollar figure for those cases and having no data from Norwalk concerning the fees generated for those cases, the Professor analyzed the plaintiff's average fee for emergency room work in Bridgeport during each year from 1984 and multiplied that number by 69, and after deducting 11.41% for expenses, he came up with a net loss per year. By that method, he determined that the net lost Norwalk income was $2,109,288 from 1984 through 1999.
In order for the court to accept that model as a measure of damages, the model again must be tested based on the CT Page 12287 reasonableness of the assumptions underlying it. The court finds this model to be even more flawed than Model I. It first assumes that the plaintiff would be on the Norwalk staff during the 1996-1998 time frame of his analysis. By that time, the plaintiff had already relinquished his privileges at the Milford Hospital in 1993 because it was not cost effective. It also assumes he would be one of the three highest volume plastic surgeons at Norwalk's emergency room in 1997, despite the fact that there were now eleven plastic surgeons on the Norwalk staff and that in some of the intervening years since 1983, his non Norwalk income more than doubled. It further assumed that once you accept the assumption of 69 cases per year that they would generate income based on average emergency room cases and fees of the plaintiff at Bridgeport area hospitals. None of these assumptions are reasonable or logical and cannot be made the basis of an award of damages for lost income.
By the plaintiff's own figures contained in exhibit 4, his per case fee average for emergency room cases started out at $535.00 per case in 1984 and was $4,265 per case in 1999, all without explanation. There is no way to reasonably conclude that case fees in Bridgeport would be duplicative of case fees in Norwalk. Based on the methodology of Model II, the plaintiff determined his gross lost income for Norwalk for 1984 to be $36,915 while under Model I it was any where from $99,359 to $126,456, triple what he made in 1983. Under this model, he concludes that the gross lost income from Norwalk for 1990 would be $263,580 and for 1994, $265,650, despite the fact that it had never exceeded $74,669 pre 1984 and was six times higher than what he grossed at Norwalk in his final year. The court has no way of concluding that that level of income was available for all the staff in 1990. The court simply cannot and will not use this model in determining damages for the reasons given.
These two models were the only evidence presented by the plaintiff for the assessment of damages. Granted it is difficult in a case such as this to establish a reasonable basis for damages, but that alone does not relieve the plaintiff from coming up with a reliable and factually reasonable method. (SeeGargano v. Heyman, supra.) The court is well aware that the issue of damages must have been a particularly difficult task for plaintiff's counsel when confronted with the fact that in the seven short years after his non reappointment at Norwalk Hospital, the plaintiff's non Norwalk gross income increased from $172,890 in 1983 to $484,981 in 1990. But the plaintiff has the CT Page 12288 burden of proving damages, Conaway v. Prestia, 191 Conn. 484,493-4 (1953), and he has not done so.
Additionally, despite the fact that the plaintiff testified that he intended to work for another ten years, neither exhibits 3 or 4 project any damages beyond the year 1999.
The evidence establishes that the plaintiff after his non reappointment at Norwalk Hospital in 1984 continued to practice in his main office in Bridgeport and was on the staff of four other hospitals. His gross income for the next ten years increased substantially each year. Neither of the models for damages set forth in plaintiff's exhibits 3 and 4 provide a reasonable basis for establishing with reasonable certainty any economic loss or damages arising out of the defendant's breach of contract, and therefore the court awards the plaintiff $1.00 in nominal damages.
GORMLEY, J.